KASICK, Appellant,

v.

KOBELAK, Appellee.

[Cite as *Kasick v. Kobelak*, 184 Ohio App.3d 433, 2009-Ohio-5239.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 92746.

Decided Oct. 1, 2009.

Alan J. Rapoport, for appellant.

Smith & Smith and Matthew H. Hallett, for appellee.

CHRISTINE T. McMONAGLE, Presiding Judge.

{¶ 1} Plaintiff-appellant, Nadine M. Kasick, appeals the January 23, 2009 judgment entries of the Cuyahoga County Probate Court overruling her objections to the magistrate's decision, adopting the decision as the findings and conclusions of the court, and dismissing the complaint. We affirm.

**I**

{¶ 2} On January 18, 2001, Nadine and her brother, defendant-appellee Paul Kobelak Jr., became co-attorneys-in-fact for their parents, Paul Kobelak Sr. and Irene Kobelak. The powers of attorney were executed by the parents because of their physical limitations; it was undisputed that they were mentally competent at the time the powers of attorney were executed and at all times thereafter. Paul Sr. passed away in August 2002, and Irene passed away in January 2007. Both had required assisted-living and/or nursing-home arrangements in the final years of their lives; Paul Jr. had sold their house in 2002. This action is relevant to the period of time starting from 2001, when Paul Jr. and Nadine were appointed attorneys-in-fact, through 2007, when Irene died.

{¶ 3} Initially, when Nadine and Paul Jr. became attorneys-in-fact, they acted jointly and cooperatively. Sometime in the summer of 2001, however, they began disagreeing about the physical and financial care of their parents. Because of their disagreements, Paul Jr. began acting as attorney-in-fact for their parents without Nadine. For example, in early- to mid-October, Paul Jr. added himself as a co-owner of his mother's passbook account and thereafter closed the account, resulting in a check for some $11,000 being issued to him. Paul Jr. then opened a money-market account with the $11,000, with him and Irene listed as joint owners, with right of survivorship. Paul Jr. testified that all this was done at his mother's direction and she was present when the money-market account was opened.

{¶ 4} Also in 2001, Paul Jr. opened a joint checking account with his mother, with right of survivorship. During the relevant time period, Paul Jr. deposited some $97,000 in the account and spent approximately $94,600 from the account for his mother's care.

{¶ 5} Because of her disagreements with Paul Jr., Nadine resigned as co-attorney-in-fact on October 29; she sent a letter to Paul Jr. on October 30 stating the same. Thereafter, Paul Jr. handled all of the parents' major financial concerns, without input or assistance from Nadine, and also helped the parents with day-to-day routine concerns. Nadine also assisted the parents with their day-to-day routine concerns.

{¶ 6} During the parents' lifetimes, they had purchased hundreds of U.S. savings bonds; some they co-owned, others were individually owned by "Paul" (without reference to "Sr." or "Jr.") or Irene, while others were co-owned by a combination of Paul Sr. and/or Irene, along with Paul Jr., Nadine, or their only grandson (Nadine's son). During the relevant time period, Paul Jr. cashed bonds at his mother's direction for her care. Paul Jr. testified that his mother determined the order for cashing the bonds.

{¶ 7} According to Nadine, after her parents' deaths, Paul Jr. still controlled their parents' finances, without providing her much, if any, information, and she "wanted to do a complete accounting" of her parents' assets. She and her husband, therefore, spent numerous hours gathering as much information about her parents' finances as they could, and hired a certified public accountant ("CPA") to review the information. After his review, the CPA found that there were "unidentified withdrawals or missing deposits" and "unidentified or questionable expenses." The CPA testified, however, that his purpose was not to make a determination about whether Paul Jr. had acted in an improper manner, but, rather, was "to trace transactions and identify deposits and withdrawals."

{¶ 8} The evidence showed that the net proceeds of the sale of the parents' house were deposited in the money-market account, and during the relevant time period, Paul Jr. spent approximately $130,000 from the account for his mother's care. After Irene's death, Paul Jr., as the survivor of the account, transferred the remaining $29,000 into his personal account. Further, after the mother's death, Paul Jr. deposited the remaining balance of some $700 from the joint checking account he had with his mother into his personal account.

{¶ 9} Nadine filed a "complaint for concealment of assets and for other relief" against Paul Jr. According to Nadine, the some $29,000 and $700 that Paul Jr. transferred from the accounts after Irene's death should have been assets of Irene's estate. Nadine also claimed that Paul Jr. cashed "her" bonds for the care of their mother, thus diminishing the total value of "her" bonds and preserving the total value of "his" bonds. She further claimed that Paul Jr. fraudulently redeemed bonds owned by their father by representing that he was owner of the bonds (i.e., bonds that named "Paul" as the owner without a "Sr." or "Jr." designation).

## II

{¶ 10} After the hearing on this matter, the magistrate issued a decision on November 14, 2008, finding that Paul Jr. was not guilty of concealing assets from either the estate of Paul Sr. or Irene. Nadine filed objections to the decision on November 25, 2008. In January 2009, the court overruled Nadine's objections, adopted the magistrate's decision as the findings and conclusions of the court, and dismissed the complaint.

## III

{¶ 11} R.C. 2109.50 provides a procedure for a party alleging that another party has concealed or embezzled assets:

{¶ 12} "Upon complaint made to the probate court of the county having jurisdiction of the administration of a trust estate or of the county wherein a person resides against whom the complaint is made, by a person interested in such trust estate or by the creditor of a person interested in such trust estate against any person suspected of having concealed, embezzled, or conveyed away or of being or having been in the possession of any moneys, chattels, or choses in action of such estate, said court shall by citation, attachment or warrant, or, if circumstances require it, by warrant or attachment in the first instance, compel the person or persons so suspected to forthwith appear before it to be examined, on oath, touching the matter of the complaint."

{¶ 13} A proceeding under R.C. 2109.50 is quasi-criminal in nature. *Goldberg v. Maloney*, 111 Ohio St.3d 211, 2006–Ohio–5485, 855 N.E.2d 856, ¶ 27. Nonetheless, the laws governing civil proceedings in probate court are applicable to such proceedings. The burden of proof, preponderance of the evidence, is on the complainant. *Estate of Goodrich* (Aug. 9, 1983), Cuyahoga App. No. 45867, 1983 WL 5636.

{¶ 14} Pursuant to Civ.R. 53(D)(4), a trial court may adopt, reject, or modify a magistrate's decision. When objections are filed, a trial court must undertake the equivalent of a de novo determination and independently assess the facts and conclusions contained within the magistrate's report. *DeSantis v. Soller* (1990), 70 Ohio App.3d 226, 232, 590 N.E.2d 886. An appellate court will apply a manifest-weight standard when reviewing the findings of a magistrate. Id.

{¶ 15} As to civil judgments, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8

O.O.3d 261, 376 N.E.2d 578, syllabus. When considering whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trier of fact were correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273. "[A]n appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." Id. at 80, 10 OBR 408, 461 N.E.2d 1273.

### A. The Court's Findings of Fact and Conclusions of Law

#### 1. The Joint and Survivorship Accounts

{¶ 16} In regard to the joint and survivorship account that Paul Jr. opened with Irene, the court noted that because of Paul Jr.'s fiduciary relationship with Irene, there was a presumption of undue influence, and the burden was on Paul Jr. to show by clear and convincing evidence that his conduct was free of undue influence. On this issue, the court found as follows:

{¶ 17} "A thorough review of these checks written by Paul [Jr.] reveals that absolutely no checks were ever written to Paul Jr. or to his family as compensation for his ongoing services as the power of attorney. Paul Jr. methodically testified to any and all 'questionable' expenditures and was, in this Magistrate's opinion, able to fully and unequivocally explain every issue raised by the Plaintiff."

#### 2. The Bonds

{¶ 18} The court found that "[t]here was no evidence presented to support Nadine's allegation of unauthorized bond redemptions. Paul Jr.'s testimony, including his unwavering attention to detail, clearly overcame any presumption of undue influence or wrongdoing as his mother's fiduciary."

### B. Paul Jr. as Attorney–in–Fact

{¶ 19} In her first assignment of error, Nadine contends that "[t]he key issue which the probate court and its magistrate both failed to address at all is whether Paul Kobelak Jr. had legal authority to act as a sole fiduciary under a durable general power of attorney, either before or after the resignation of his co-fiduciary, Nadine Kasick."

{¶ 20} The designating documents named Paul Jr. "and" Nadine as co-attorneys-in-fact. Because of the use of "and" instead of "or" or "and/or," Nadine contends that Paul Jr. could not have acted as an attorney-in-fact for their parents without her consent and approval. We disagree.

{¶ 21} Because of the lack of case law on this issue,[1] we look to the definition of a power of attorney: "A power of attorney is an authorization by one person, the principal, to another, the attorney-in-fact, granting to the attorney-in-fact the power to conduct the principal's business or personal affairs." 1 Anderson's Ohio Probate Practice and Procedure (10th Ed.2009) 509, Section 30.01. Thus, the contractual relationship created by a power of attorney is between the principal and the attorney-in-fact.

{¶ 22} Before an Ohio court may consider the merits of a legal claim, the person seeking relief must establish standing. *Ohio Contrs. Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 320, 643 N.E.2d 1088. At its core, the question of standing is whether a litigant is entitled to have a court decide the merits of a dispute or of particular issues. *Warth v. Seldin* (1975), 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343. The powers of attorney created relationships between the parties and their parents, not between Paul Jr. and Nadine. Nadine does not have standing to challenge her brother's contractual relationship with their parents in this action. Moreover, upon the parents' deaths, Paul Jr.'s power of attorney was terminated, and any action against Paul Jr. would lie with the estates, not Nadine.

{¶ 23} Accordingly, the first assignment of error is overruled.

C. Concealment of Assets

{¶ 24} In her second and third assignments of error, Nadine challenges the trial court's finding that Paul Jr. did not conceal assets, generally, and specifically, the savings bonds.

{¶ 25} In regard to the joint accounts with right of survivorship that Paul Jr. opened with his mother, Ohio law establishes that the opening of a joint-and-survivorship account, in the absence of fraud, duress, undue influence, or lack of capacity, is conclusive evidence of the intention to transfer to the surviving party the survivorship interest in the remaining balance at the time of the co-owner's death. *Wright v. Bloom* (1994), 69 Ohio St.3d 596, 635 N.E.2d 31, paragraph two of the syllabus. However, when a fiduciary relationship exists between the creator and the beneficiary, there is a presumption of undue influence. *Studniewski v. Krzyzanowski* (1989), 65 Ohio App.3d 628, 632, 584 N.E.2d 1297. Once this presumption arises, the burden of going forward shifts to the beneficiary to show that his conduct was free of undue influence. Id. It is well established that the holder of a power of attorney has a fiduciary relationship

---

1. Nadine argues that "[t]he rule which this Court should adopt would state that if one of two co-attorneys does not consent to an action by the other co-attorney, lack of consent must be assumed."

with the principal. *In re Scott* (1996), 111 Ohio App.3d 273, 276, 675 N.E.2d 1350, citing *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094.

{¶ 26} Undue influence is "'any improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forebear an act which he would not do or would do if left to act freely.'" *Ross v. Barker* (1995), 101 Ohio App.3d 611, 618, 656 N.E.2d 363, quoting *Marich v. Knox Cty. Dept. of Human Servs.* (1989), 45 Ohio St.3d 163, 166, 543 N.E.2d 776. Undue influence must be proven by clear and convincing evidence. *Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009–Ohio–36, 905 N.E.2d 1246, ¶ 38. In order to make the requisite showing of undue influence, four essential elements must be proven: (1) an individual was susceptible to undue influence, (2) another person had an opportunity to exert undue influence over the susceptible individual, (3) improper influence was exerted or attempted, and (4) the result shows the effect of such influence. *Ross* at 618, 656 N.E.2d 363.

{¶ 27} Both Paul Jr. and Nadine testified that their parents' competency was not an issue. They also both testified that their parents were aware and in control of their financial situation. For example, Nadine explained how beginning in the mid–1980s, she helped her parents obtain day-to-day necessities, such as medications and groceries. Her father would give her cash up front, and she would purchase the items he requested. Her mother would request items, Nadine would purchase them, give her mother the receipts, and her mother would reimburse her. Nadine acknowledged that Paul Jr. was also helping their parents with obtaining day-to-day necessities. Nadine admitted that the CPA's report did not account for these day-to-day cash expenditures.

{¶ 28} Further, in regard to the money-market account, Paul Jr. opened the account at his mother's direction and in her presence. The evidence shows that in the relevant time period, Paul Jr. wrote 71 checks to be drawn from that account, totaling some $130,000, which was used directly for Irene's care and support. Similarly, in regard to the checking account, the checks drawn from that account were primarily for the care and support of the parties' parents. There is no evidence in the record that the creation or subsequent use of these accounts were the result of Paul Jr. exerting undue influence over Irene. As such, Paul Jr. was entitled to the survivorship interest in those accounts upon Irene's death.

{¶ 29} Moreover, Paul Jr. was able to explain much of what Nadine's CPA had labeled in his report as "unaccounted for," "missing," "unidentified," or "questionable" amounts. For example, one of the "unaccounted for" amounts identified in the CPA's report was a withdrawal of some $13,000 from the money-market

account. Paul Jr. was able to document with receipts that the funds were used for Irene's assisted-living care. The CPA agreed that because of Paul's documentation, that "unaccounted for" amount in his report should be disregarded.

{¶ 30} Without going over each and every one of Paul Jr.'s explanations for "unaccounted for," "missing," "unidentified," or "questionable" amounts, it suffices to say that he was able to account in pretty exacting detail, considering the six-year time period and number of transactions involved, his handling of his parents' finances. Moreover, neither Nadine's nor the CPA's testimony served to contradict Paul Jr.'s testimony.

{¶ 31} Nadine testified that after her resignation as an attorney-in-fact, she thought Paul Jr. "would go out and have a new one drawn up without my name on it; that he would just be the power of attorney for my parents." In other words, she did not think that Paul Jr. would stop acting on their parents' behalf. Further, during the relevant time period, Nadine received $46,000 from redeemed bonds of her parents; she admitted that none of that money was used for her parents' care or support. Nadine also explained in more detail what prompted her to question her brother's actions:

{¶ 32} "I remember—recall my father saying how much money he had saved up, and he—told—my brother and I were present at the time. He says, boy, with all my assets and the house, by the time I'm gone, you two are going to be millionaires. And I didn't—really didn't believe that; and then I got to thinking how [frugally] my parents lived their life and the income my father had * * *."

{¶ 33} When the magistrate opined that the "millions" Nadine believed her parents possessed had all gone for their health care, Nadine responded, "[Y]es. And I'm okay with that."

{¶ 34} Further, as already mentioned, the CPA did not make a determination that Paul Jr. had acted in an improper way; rather, he traced transactions and identified deposits and withdrawals, and Paul Jr. was able to explain many of the transactions that the CPA had labeled "unidentified withdrawals or missing deposits" and "unidentified or questionable expenses."

{¶ 35} Finally, in regard to Paul Jr. cashing savings bonds [2] listing "Paul" (without reference to "Sr." or "Jr.") as their owner, Paul Jr. testified that his father gave them to him as a gift over 25 years ago. As already mentioned, R.C. 2109.50 contemplates a wrongful or culpable withholding or concealing of assets by the accused. On this record, we do not find that Paul Jr.'s redeeming and keeping $1,791.70 worth of bonds that he testified he believed his father gifted to him constituted a wrongful or culpable withholding or concealing of

---

2. The total of which amounted to $1,791.70.

assets, especially in light of the fact that Nadine received some $46,000 from the redemption of her parents' bonds, none of which was used for their care and support.

{¶ 36} On this record, competent and credible evidence supported the trial court's findings of fact and conclusions of law, and therefore, the second and third assignments of error are overruled.

Judgment affirmed.

BLACKMON and JONES, JJ., concur.