[Cite as *Young v. Kaufman*, 2017-Ohio-9015.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**Nos. 104990 and 105359**

---

# LAUREL K. YOUNG, ET AL.

PLAINTIFFS-APPELLANTS

vs.

# JOSH S. KAUFMAN, ET AL.

DEFENDANTS-APPELLEES

---

## JUDGMENT:
REVERSED; REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Probate Division
Case No. 2014-ADV-201972

**BEFORE:** E.A. Gallagher, P.J., Kilbane, J., and Jones, J.

**RELEASED AND JOURNALIZED:** December 14, 2017

**ATTORNEY FOR APPELLANTS**

Richard G. Johnson
Richard G. Johnson Co., L.P.A.
220 Crittenden Court Building
955 West St. Clair Avenue
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEES JOSH KAUFMAN, KIM KAUFMAN AND DOUG KAUFMAN IN THEIR CAPACITIES AS CO-EXECUTORS AND CO-TRUSTEES**

John E. Schiller
Jamie A. Price
Walter Haverfield L.L.P.
1301 East Ninth Street, Suite 3500
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE JOSH KAUFMAN**

Leon A. Weiss
Adam M. Fried
Paul R. Shugar
Reminger Co., L.P.A.
101 Prospect Avenue, #1400
Cleveland, Ohio 44114

Adriann S. McGee
Reminger Co., L.P.A.
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215

**ATTORNEYS FOR APPELLEE KIM KAUFMAN**

Jeffrey P. Consolo
Michael G. Latiff
McDonald Hopkins L.L.C.
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE DOUG KAUFMAN**

Joseph C. Weinstein
Rebecca W. Haverstick
Squire Patton Boggs
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114

EILEEN A. GALLAGHER, P.J.:

{¶1} This consolidated appeal involves a challenge by plaintiffs-appellants Laurel Young ("Lori") and James Kaufman ("Jim") (collectively, "appellants") to their deceased mother's estate plan. Appellants claim that the estate plan, which disinherited Lori and Jim — two of the decedent's five children — is not valid because it was the product of undue influence by two of their siblings, Josh Kaufman ("Josh") and Kim Kaufman ("Kim") (the "contest claim"). Appellants also seek to remove Josh and Kim as co-executors and co-trustees of the decedent's will and trust based on their alleged breaches of fiduciary duty (the "removal claim"). Appellants appeal from the Cuyahoga County Court of Common Pleas, Probate Division's (the "probate court's") orders entering summary judgment in favor of defendants-appellees Josh, Kim and Doug Kaufman ("Doug"), individually, and in their capacities as co-executors and co-trustees of the estate of Joyce Kaufman, deceased (collectively, "appellees") on appellants' contest claim (Appeal No. 104990) and removal claim (Appeal No. 105359). For the reasons that follow, we reverse the trial court's judgment and remand the matter for further proceedings.

**Factual and Procedural Background**

**The Family and the Family Businesses**

{¶2} The decedent, Joyce Kaufman ("Joyce"), passed away on August 6, 2013. She had five children — Jim, Lori, Doug, Kim and Josh. David Kaufman ("David"), Joyce's second husband, was the biological father of Josh and Kim. David adopted Jim, Lori and Doug after marrying Joyce.

**{¶3}** David was the founder of several family businesses including American Consolidated Industries, Inc. ("ACI") (a holding company), Monarch Steel Corporation ("Monarch") (a steel business) and Anchor Industries, Inc. ("Anchor") (a business supplying aftermarket automotive engine and transmission mounts). Monarch and Anchor were originally both subsidiaries of ACI. David gave each of the children stock in the businesses. Following David's death in 1997, Joyce became the sole voting shareholder in the businesses and continued as the sole voting shareholder until her death.

**{¶4}** In the late 1990s or 2000, Jim redeemed his shares in the family businesses for $7 million. In 2002 or 2003, Lori redeemed her shares in the family businesses for a similar sum. At the end of 2009, Anchor was spun off from ACI. Doug bought Josh's shares of Anchor and Josh bought Doug's shares of Monarch. After the buyouts, Kim and Joyce remained shareholders of both Anchor and Monarch.

**Joyce's Estate Plan**

**{¶5}** In 1993, Joyce executed an estate plan that provided for the disposition of her assets first to her husband and thereafter to her five children. In 1999, she modified her estate plan to exclude Jim as a beneficiary except for a $1,000 bequest. Joyce made additional changes to her estate plan in 2000. Under these modifications to her estate plan, Joyce's personal property was to be disposed of at the discretion of Kim, and Lori, Doug, Kim and Josh were to receive the balance of her assets. In 2000, Joyce also executed a durable power of attorney, appointing Doug and Kim jointly as her attorneys-in-fact.

{¶6} Jim testified that Joyce's decision to exclude him from her estate plan in 1999 and 2000 was not unexpected, based on a conversation he had had with Joyce in or around 2000 or 2001.   As Jim testified:

Q. * * * And she talked about her estate plan then?

A.   Not specifically her estate plan, but the idea that she wanted each kid to have equal liquidity and I received mine.

Q.   And what did that mean to you?

A.   At that point in time that meant to me that if she was doing a will or trust or any estate planning it would probably be divided by four.

Q.   Because you had been bought out?

A.   Correct.

Q.   So that made sense to you, didn't it?

A.   It did.

Q.   And you knew, you've come to learn that you were excluded from your mom's trust?

A.   And I would agree with that and was not necessarily aware of it, but was in agreement that that should have been done that way.

Q.   What do you mean it was an agreement?

A.   I didn't know that she did that, but I had no dispute with that being done * * * [b]ecause she had explained to me about the liquidity and I was okay with that.

**Joyce Revises Her Estate Plan**

{¶7} In 2009, Joyce took steps to revise her estate plan.   Joyce initially worked with attorney Joan Gross, a partner with the law firm Hahn Loeser & Parks, L.L.P.

("Hahn Loeser"), to revise her estate plan. Although it was not involved in her 1993 estate plan or the modifications thereto, Hahn Loeser had previously done legal work for other family members and certain of the family businesses, including Monarch.[1]

{¶8} Around the time Joyce began working with Gross, she also began working with accountant Phil Baptiste, who assisted her with tax-related issues. According to Baptiste, Joyce and ACI had been clients of his accounting firm, Cohen & Company, for a number of years but the family had become unhappy with them. In an effort to retain the family as a client, in early 2009, Baptiste met first with Josh, then with Joyce, to discuss the family's issues.

{¶9} Baptiste testified that when he first met with Joyce, he inquired about the state of her estate planning. He testified that Joyce indicated that she wanted to update her estate plan. According to Baptiste, Joyce did not indicate specifically what changes she wanted to make, but that, "in broad terms," "[s]he was well kind of settled that * * * Jim and Lori had both been bought out of the businesses, so they sort of had received their money already." Baptiste testified that "from day one" Joyce was "very clear" that her beneficiaries would be Josh, Kim and Doug and that the details that were being worked out from April 2009 until her estate plan was finalized in 2010 were "smaller but

---

[1]In addition to assisting Joyce with her estate planning, Hahn Loeser had served as counsel for Monarch beginning in the 1990s. The firm also later served as "counsel for the transaction" when Doug and Josh separated their business interests from one another in 2009 and advised Kim on certain issues during the early stages of her divorce.

emotional type items that had to be resolved." Baptiste testified that Joyce did not use email and that he communicated with her via telephone or in-person meetings.

{¶10} In January 2009, Joyce had a meeting with Gross, Baptiste, Gross' partner Larry Oscar, and Joyce's business advisor, David Stith, to discuss her objectives for her new estate plan. Gross testified that, at the meeting, Joyce stated that she wanted only three of her children to inherit under her new estate plan — Josh, Kim and Doug — and that she documented this in her notes. According to Gross, Joyce explained that she did not intend to include Jim and Lori as beneficiaries in her new estate plan because they had already received their share of the family's wealth when they redeemed their company stock.[2] Oscar similarly testified that Joyce had informed him that Jim and Lori were to be excluded from her estate plan because they had already received their inheritance through the buyout of their interests in the family businesses.

{¶11} Following the January 2009 meeting, Gross sent Joyce a summary of a proposed estate plan and a flow chart showing how the estate plan would work. The summary excluded Jim and Lori from inheriting under the new estate plan. After a second meeting in February, Gross sent Joyce a revised summary and flow chart. The

---

[2]Gross testified that Oscar refreshed her recollection regarding why Jim and Lori were to be excluded from Joyce's estate plan in 2009 when she was preparing for her deposition. Gross testified that prior to her deposition, she had a brief conversation with Oscar in which they discussed what they each remembered regarding the preparation of Joyce's estate plan. Gross testified that, initially, she could not recall "why Joyce had prepared her estate plan the way she prepared it," but that after Oscar told her what he recollected, i.e., that Jim and Lori were excluded from the estate plan because they had already received their share of the family's wealth when they were bought out of the family businesses, "that refreshed my memory and I remembered clearly that that is what she had said."

revisions involved changing the order in which the three children who were beneficiaries served as fiduciaries and setting up a trust for Joyce's grandchildren. None of Joyce's children were present during Gross' meetings with Joyce or otherwise a party to Gross' communications with Joyce.

{¶12} In April 2009, Gross forwarded draft estate planning documents that excluded Jim and Lori as beneficiaries to Joyce for her review. Joyce, however, never signed them. Gross testified that Joyce informed her that she would not sign the estate planning documents Gross had prepared until some of her children repaid several outstanding promissory notes they owed her.[3] According to Gross, Joyce wanted to use the proceeds of the notes to fund a trust for her grandchildren and refused to sign the estate planning documents as Joan had drafted them because she was considering making additional changes to her estate plan once the promissory notes were repaid. Joyce did not indicate to Gross what those changes might be. Gross testified that she communicated with Joyce via mail, federal express, in-person meetings or telephone.

{¶13} In the summer of 2010, Joyce began working with another Hahn Loeser attorney, Steve Gariepy, on her new estate plan. Oscar testified that in August 2010, Josh informed him that Joyce was not comfortable moving forward with Gross and wanted to retain another attorney to complete her estate plan. As to why Joyce decided to switch counsel, Oscar testified that, *according to Josh*, Joyce was displeased with the time and expense Gross had dedicated to a potential gift tax issue that, after additional

---

[3] It appears that Josh, Kim and Doug each had outstanding promissary notes.

facts were known, allegedly proved not to be a significant concern.[4]  After interviewing several attorneys, *Josh informed* Oscar that Joyce had selected Gariepy to complete her estate plan.  Gariepy testified that in addition to completing Joyce's estate plan, it was also originally contemplated that he would assist Josh and Kim in the development of their estate plans and would assist with a buyout of Kim and Joyce's stock in Anchor.  Josh and Kim later retained separate counsel to prepare their individual estate plans.

**{¶14}** On August 26, 2010, Gariepy had his first meeting with Joyce, Kim and Josh.  His notes from the meeting include a notation, "Joyce  Oh. resident; five children but only three bens.  No e.p. [estate plan], just handwritten, and HLP drafts.  72."  Following the meeting, Gariepy sent a memorandum to Joyce, Kim and Josh (by fax to Joyce to her home fax[5] and by email to Josh) summarizing their meeting and identifying the open issues that remained with respect to Joyce's estate plan (the "August 30, 2010 memorandum").  Under the heading "Joyce's Will and Revocable Trust," the memorandum indicated that Joyce would leave her tangible personal property to Kim and that the balance of her estate would be divided equally into three separate trusts for Kim, Doug and Josh.

---

[4]Specifically, after reviewing the buyout agreements for Jim and Lori, Gross was concerned that Joyce may have forgiven certain debt Jim and Lori owed her without consideration and, therefore, owed gift tax, including penalties and interest, on that sum.

[5]There was no testimony regarding the extent to which Joyce used her home fax machine during this time period.  However, in support of their motion for summary judgment, appellees submitted an affidavit of John Schiller, counsel for the estate, attaching a copy of Gariepy's August 30, 2010 memorandum with handwritten notes.  Schiller stated in his affidavit that he collected the document along with others from Joyce's home in September 2016.

{¶15} On September 7, 2010, *Josh emailed* Gariepy and asked several questions regarding the memorandum"after discussing this with my [m]om."  Josh testified that because Joyce "didn't do email," he handled many of the communications with Gariepy on her behalf.   Joyce was not copied on Josh's email to Gariepy.   A week later, Gariepy emailed Josh a response, copying Joyce by fax.   Gariepy could not recall whether he had any discussions with Joyce regarding the issues raised in Josh's email.

{¶16} On November 16, 2010, Gariepy faxed a progress report and engagement letter to Joyce, copying Josh and Kim, updating them regarding the progress he had made towards Joyce's estate plan and the proposed buyout of the Anchor stock.   He indicated that "[a]t our August 26th meeting I could see that your goals and decisions are still in a state of flux and that you were not ready to make some basic decisions."   He further indicated that he had "not heard back yet on the basic questions, such as whom you would like to name as executor and beneficiaries, raised in my August 30th memo."   Gariepy indicated that he could "now see that your thinking on your estate plan objectives and fiduciaries has changed" and provided fee estimates for the work that remained to be performed on Joyce's estate plan and related issues.[6]   He requested that Joyce "confirm that all of the above meets with your approval by return fax or email."

{¶17} *Josh responded by email*, copying Baptiste but not Joyce.   Josh stated that he and Baptiste had met with Joyce the previous day and responded to each of the issues raised by Gariepy.   Specifically, he indicated that Kim, Josh and Doug would be the

---

[6]His fee estimate for the work that remained to be done on the will and revocable trust was $19,000.

executors of Joyce's estate, that Kim would receive all of Joyce's jewelry and that the balance of Joyce's estate would "be split evenly between [sic] Josh, Kim and Doug (excluding the 2 homes which will be handled separately)." Josh concluded his email by stating, "I believe we have answered most if not all of the questions regarding my [m]om's intent" and requested that Gariepy let him know "if there is anything additional in regards to this." Although he could not recall how or when he did so, Gariepy testified that he knows, based on his "[p]rotocol, 30 years," that he verified with Joyce that Josh's email accurately reflected her intent. However, there is nothing in his notes or billing records that documents this nor is there any indication in his billing records that he traveled to meet with Joyce.

{¶18} Gariepy responded to Josh via email, copying Baptiste via email and Joyce via fax. He addressed *the concerns Josh had raised* regarding his estimated fees and indicated that he "will need Joyce's approval as the client to the engagement letter with the estimates * * * in order for me to proceed."

{¶19} Two weeks later, on December 2, 2010, *Josh emailed Gariepy*, complaining about his lack of response to "the two voicemails I left this week" and asking him "to confirm where we are with the will and trust for my mom today." Gariepy responded that "as requested in my last e-mail, your Mom [sic] as the client will need to fax her confirmation approving my fee estimates." Josh replied, "That was the purpose of the voicemail she and I left you Monday." Joyce was not copied on any of these emails. A couple of hours later, Gariepy sent an email, thanking Joyce "for approving the go ahead on the will and trust and related fee estimates" and indicated that he would have the will

and trust ready for signature on December 15, 2010.  Gariepy could not recall how it was that he got the "go ahead" from Joyce to move forward with the will and trust.

{¶20}  Josh responded to Gariepy's email, copying Joyce via fax and email, and stated that the signing needed to be moved up a week because Joyce was leaving for Florida on December 14.  The execution of the will and trust was then scheduled for December 10, 2010.

{¶21} Gross drafted Joyce's 2010 estate plan for Gariepy.  Gross testified that the 2010 estate plan involved "a very simple change" from the estate plan she had prepared for Joyce a year earlier, i.e., removing the trust for the grandchildren from the estate plan.  Gross testified that because she was no longer in contact with Joyce or any other member of the Kaufman family, she relied on Gariepy to ensure that the 2010 estate planning documents accomplished what Joyce intended.

{¶22} On December 7, 2010, Gariepy attempted to fax a summary of the will and trust to Joyce, copying Josh via email, but the fax did not go through.  He, therefore, emailed the document to Joyce and Josh and asked Josh to deliver a copy to her.  Josh confirmed that he had received the document, indicated that he had faxed the document to his mother and that they planned on "reviewing it together" the following morning.

{¶23} On December 10, 2010, Joyce signed her last will and testament (the "2010 will") and the third amendment to declaration of trust (Joyce S. Kaufman Revocable Trust Agreement) dated December 10, 2010 (the "2010 trust") (collectively, the "2010 estate

plan"),[7] which excluded Jim and Lori as beneficiaries. Josh accompanied Joyce to the meeting in which she executed the 2010 estate plan. The 2010 trust included an "excluded persons" provision that stated, "I have intentionally made no provision herein for my son, JAMES S. KAUFMAN, and my daughter, LAUREL K. YOUNG."[8] However, there was no explanation in the will or trust as to specifically why Jim and Lori were excluded as beneficiaries. The 2010 will also included an in terrorem provision, providing that if any beneficiary contested the will or trust that they would no longer receive any inheritance under the 2010 estate plan.

{¶24} Gariepy could not recall whether Joyce was sent copies of the completed estate plan documents for her review before she signed them. He testified that, based on "protocol," he knows that he met with Joyce alone to discuss her intentions at some point prior to her execution of the estate planning documents — but he could not recall where or when they met. He also testified that he had an additional in-person meeting with Joyce to discuss her estate plan sometime between December 7, 2010, when he emailed the summary to her and Josh, and December 10, 2010, when Joyce executed the estate plan but he could not recall when it occurred, where it occurred, who was present or what was discussed regarding the estate plan. His billing records do not reflect these meetings. Gariepy testified that although he could not specifically recall having done so,

---

[7]In December 2010, Joyce also executed a living will, a durable power of attorney naming Kim, then Josh, then Doug, as her attorney-in-fact and a health care power of attorney naming Kim as her agent for health care, with Josh as the first alternate and Doug as the second alternate.

[8]The 2010 will was a pour-over will, such that the trust disposed of Joyce's assets rather than the will.

he believed he reviewed the estate plan with Joyce again before she signed the documents on December 10, 2010 because it's what he "always do[es] as a matter of protocol" and he had no reason to believe he did anything differently in this case.

**{¶25}** Gariepy and Cheryl Mosback, a Hahn Loeser legal assistant, witnessed Joyce's signatures on the will and trust. Gariepy testified that, consistent with his attestation, he believed Joyce was "of sound and vigorous mind and memory" at the time she signed the 2010 estate plan and that she understood every aspect of the distribution of her estate.

**{¶26}** After Joyce executed the 2010 estate plan, Gariepy sent an email to Josh and fax to Joyce reminding them that Joyce needed to transfer her bank accounts to the trust. The following week, *Josh emailed* a KeyBank relationship manager and requested that his mother's accounts be re-titled in the name of the trust. Another KeyBank representative responded and advised him of the procedure for doing so, i.e., that they needed copies of pages from the trust and a new signature card signed by Joyce. Joyce was not copied on these exchanges.

**{¶27}** Gariepy mailed a copy of the executed 2010 estate plan to Joyce in January 2011. Gariepy requested that Joyce sign and return a copy of the cover letter acknowledging her receipt of the documents, but there is nothing in the record that indicates that she did so.

**{¶28}** In the spring of 2013, Joyce was diagnosed with Stage IV lung cancer. After her diagnosis, she once again took steps to revise her estate plan. Gariepy testified that on April 19, 2013, he had a meeting with Joyce, Josh and Kim in which Joyce

indicated that she wanted to revise her estate plan so that all five children would share in the assets of her estate. On April 23, 2013, Gariepy emailed Joyce an outline and diagram of a new estate plan, copying Josh, pursuant to which the balance of Joyce's assets, after specific distributions were made, was to be shared by "all five children equally."

{¶29} The next day, *Josh emailed Gariepy*. Josh stated that "my mom asked that you not include her on emails" and inquired if there was "a way to send a copy of the billing as you currently do along with another that does not contain quite the detail * * * ." On April 28, 2013, Gariepy emailed an updated outline and chart to Josh "to pass along to Joyce." Joyce was not copied on the email. In the updated draft of the new estate plan, the balance of Joyce's assets after specific distributions were made was to be shared by "all five children equally." Gariepy testified that he heard nothing further from the Kaufman family regarding Joyce's estate plan for the next two months.

{¶30} Jim testified that in mid-May 2013, he had a conversation with Joyce in which she told him that he needed to "get down and see Gariepy, what he did was a sin." Jim claims that his mother told him that "everything was supposed to be equal" and that when she executed her 2010 estate plan, she had been under "intense" pressure from Josh. Jim testified that Joyce then called Josh over and told her that he needed to set up a meeting with him, Jim and Gariepy "to get done what I asked you to get done." Jim testified that by June 2013, Joyce was frustrated and upset regarding the lack of progress on her new estate plan.

**{¶31}** In early July 2013, Gariepy had a meeting with Jim and Josh regarding Joyce's proposed revised estate plan and emailed them an updated "checklist" of outstanding issues. Jim and Josh also contacted Squire, Sanders & Dempsey, L.L.P. attorney Jim Spallino to discuss him taking over Joyce's estate planning work. Jim claimed that Joyce directed him to change attorneys because Gariepy was not moving quickly enough on her new estate plan and that Josh was supposed to make the arrangements with Gariepy to forward Joyce's estate planning file to Spallino but never did so.

**{¶32}** In mid-July 2013, Joyce met with all five of her children (the "July 2013 family meeting"). Jim testified that during this meeting, Joyce told each of her children that she wanted them all "to get along," that she wanted her estate to be divided equally among them and that she wanted the proceeds of her life insurance policies to be used to pay her estate taxes. Jim testified that Joyce made all of her children promise that they would follow her wishes. Joyce died before any new estate plan was finalized or executed.

**{¶33}** On April 7, 2014, appellees filed an application for authority to administer Joyce's estate based on the 2010 estate plan and the will was admitted to probate. Josh, Kim and Doug were designated co-executors under the will and co-trustees of the trust.

**The Litigation**

**{¶34}** On October 10, 2014, appellants filed a "will contest" complaint against appellees, individually and in their capacities as co-executors of Joyce's estate and co-trustees of the trust, challenging the validity of the 2010 will and trust and seeking to

remove Josh and Kim as executors and trustees. Appellants alleged that the 2010 estate plan did not reflect Joyce's testamentary intent and that Joyce's true intent — as she expressed to all of her children shortly before her death — was for her assets to be divided equally among her five children. Appellants alleged that Josh and Kim had improperly influenced Joyce to exclude them under her 2010 estate plan and had impeded Joyce's efforts to revise her estate plan in 2013 to include all five children. Appellants further alleged that after Joyce's death, Kim and Josh took various actions to benefit themselves to the detriment of appellants and Joyce's estate, including converting Joyce's personal property to themselves, locking appellants out of their mother's homes and failing to use the life insurance proceeds to pay estate taxes. Appellants sought (1) a declaratory judgment that the 2010 will and trust be set aside as void due to appellees' self-dealing and/or exertion of undue influence over Joyce, (2) removal of Josh and Kim as co-executors and co-trustees due to their alleged breaches of fiduciary duty, (3) recovery of their attorney fees and costs and (4) "any other relief that the Court deems just and proper."

{¶35} Josh, Kim and Doug filed a joint answer to appellants' complaint in their capacities as co-executors and co-trustees and separate answers to appellants' complaint in their individual capacities. They denied appellants' allegations of self-dealing and undue influence and asserted various affirmative defenses. In his separate answer, Doug admitted that (1) Joyce was dissatisfied with the 2010 estate plan prepared by Hahn Loeser and (2) had advised all of her children prior to her death that her estate was to be divided equally among them. Josh and Kim denied these allegations.

**{¶36}** On September 16, 2015, Josh filed a motion for a protective order and to bifurcate the contest claim from the removal claim. The parties had been involved in discovery disputes regarding access to financial records relating to Josh's personal finances and the businesses that were assets of the estate. Josh argued that appellants should be required to demonstrate a genuine issue of material fact with respect to the contest claim before they were permitted to obtain discovery regarding financial matters. Appellants opposed the motion. On December 9, 2015, the probate court granted the motion to bifurcate, concluding that the only issues relevant to the contest claim were (1) Joyce's mental condition at the time she executed the 2010 estate plan and (2) whether undue influence was exercised that caused her to execute the 2010 estate plan. The probate court further held that appellants would not have standing to pursue the removal claim unless they could first establish that they were interested parties to the estate. The probate court stayed any efforts by appellants to obtain financial information from Josh, the businesses or any banks that had entered into loan agreements with the businesses.

**Motions for Summary Judgment**

**{¶37}** On April 28, 2016, appellees filed a motion for partial summary judgment on appellants' contest claim, asserting that there was no genuine issue of material fact that Joyce did not lack testamentary capacity when she executed the 2010 estate plan and that the estate plan was not the product of undue influence.[9]

---

[9]In support of their motion for summary judgment, appellees submitted excerpts of the depositions of Lori, Jim, Josh, Kim, Gariepy, Gross, Oscar, Baptiste and Stith, copies of the 1993 estate plan, the 1999 and 2000 modifications to the 1993 estate plan, the 2010 estate plan, Gross' February 10, 2009 memorandum, Gariepy's August 30, 2010 and December 7, 2010 memoranda and

**{¶38}** Appellants opposed the motion, asserting that the "full evidentiary record" shows that Josh and Kim had a confidential relationship with Joyce and exerted undue influence over her "to skew her true estate wishes in their favor" when she executed her 2010 estate plan. Appellants argued that a presumption of undue influence applied based on Josh and Kim's relationship with Joyce, their active involvement in the preparation of her estate plan and the conflicts of interest among the Hahn Loeser attorneys who prepared her estate plan. They also argued that genuine issues of material fact existed regarding Joyce's "true wishes" with respect to her 2010 estate plan, her susceptibility to undue influence and whether, in fact, she was unduly influenced.[10]

**{¶39}** On June 24, 2016, the probate court granted appellees' motion for partial summary judgment on the contest claim. The probate court found that appellants had failed to present any evidence establishing that Joyce was susceptible to undue influence

related emails, a medical examination report for Joyce dated December 3, 2010, an affidavit from Baptiste regarding his involvement in Joyce's estate planning and related matter and an affidavit from attorney John Schiller, counsel for the estate, authenticating certain documents.

[10]In support of their opposition to appellees' motion for summary judgment, appellants submitted excerpts of the depositions of Lori, Jim, Josh, Kim, Gariepy, Gross, Oscar and Baptiste, copies of the 1993 estate plan, the 1999 and 2000 modifications to the 1993 estate plan and the 2010 estate plan, portions of Joyce's cell phone records, copies of Hahn Loeser's billing records, copies of documents relating to various promissory notes, portions of Gariepy's notes, Gross' February 10, 2009 memorandum, Gariepy's communications with the Kaufman family relating to Joyce's estate plan and Josh's responses in 2010 and 2011, a KeyBank power-of-attorney designation and payable-on-death designation in favor of Kim dated November 25, 2010, email communications among Hahn Loeser attorneys regarding Joyce's estate planning work from 2010, an affidavit from attorney Leslie Vargo, Lori's counsel, authenticating certain documents and an affidavit and expert report from attorney Michael Murman, addressing the **conduct of Joyce's attorneys, her attorneys' alleged conflicts of interest and Joyce's alleged susceptibility to undue influence by her attorneys.**

at the time she executed the 2010 estate plan, that there was no evidence of any connection between Kim's actions and the 2010 estate plan and that the case law did not support a finding that Josh was in a confidential relationship with Joyce so as to give rise to a presumption of undue influence. The probate court further found that undisputed evidence established that Joyce's 2010 estate plan reflected her "consistent stated objectives over a period of time," that there was no evidence that Josh or Kim exerted any influence over Joyce that made her exclude Jim and Lori from her estate plan and that there were no genuine issues of material fact as to Joyce's testamentary capacity at the time she executed her 2010 estate plan.

{¶40} On June 30, 2016, appellants filed a motion for reconsideration or, in the alternative, request for a final order, asserting that the probate court had made various "mistakes" and "misstatements" that warranted reconsideration of its summary judgment ruling. The probate court denied the motion for reconsideration. On August 23, 2016, the probate court entered a judgment entry stating that its prior judgment entry on summary judgment was a final, appealable order, certifying that there was no just reason for delay under Civ.R. 54(B). Appellants appealed the probate court's order.

{¶41} In July 2016, appellees filed a second motion for summary judgment on the removal claim, arguing that (1) in light of the court's ruling granting summary judgment on the contest claim, appellants lacked standing to seek removal of appellees as co-executors and co-trustees because appellants were not beneficiaries of the 2010 will and trust and (2) there was no evidence of any self- dealing by appellees in breach of their fiduciary duties. Appellants opposed the motion, asserting that they had standing based

on an oral trust that was created at the July 2013 family meeting when Joyce allegedly informed her children that she wanted them to share equally in the assets of her estate. In support of their opposition, appellants attached an affidavit from Jim, detailing the events leading up to the July 2013 family meeting and Joyce's efforts to revise her estate plan in 2013, and several emails relating to Joyce's intent in 2013 to revise her estate plan to allow Jim and Lori to share in her estate.

{¶42} On January 5, 2017, the probate court granted appellees' second motion for summary judgment, rejecting appellants' "newly created oral trust theory" as a basis for standing on their removal claim. The probate court reasoned that appellants (1) appellants had failed to plead the existence of an oral trust or that they were beneficiaries of Joyce's estate by virtue of an oral trust in their complaint, (2) had made no argument, when opposing summary judgment on the contest claim, that the 2010 estate plan was invalid due to the creation of a subsequent oral trust and the probate court had already determined, in granting appellees' motion for summary judgment on the contest claim, that the 2010 will and trust were valid and (3) could not establish the existence of an oral trust based on the applicable law. Once again, appellants appealed. This court granted appellants' motion to consolidate the appeals.

{¶43} In their appeals, appellants have raised the following ten assignments of error for review:

Assignment of Error No. 1:
The Trial Court erred when, on or about December 9, 2015, it granted the Defendants' Motions for a Protective Order and to Bifurcate the Claims.

Assignment of Error No. 2:

The Trial Court erred when, on or about May 25, 2016, it denied the Plaintiffs' Motion for Leave to Amend the Complaint.

Assignment of Error No. 3:
The Trial Court erred when, on or about May 26, 2016, it denied the Plaintiffs' Motion to Compel against non-party Hahn Loeser & Parks L.L.P.

Assignment of Error No. 4:
The Trial Court erred when, on or about May 26, 2016, it granted in part the Defendants' Motion to Quash against non-party Cohen & Co., Ltd.

Assignment of Error No. 5:
The Trial Court erred when, on or about May 26, 2016, it denied the Plaintiffs' Civil Rule 56(F) Motion for an Extension of Time.

Assignment of Error No. 6:
The Trial Court erred when, on or about June 24, 2016, it denied the Plaintiffs' Omnibus Motion for Clarification and Reconsideration.

Assignment of Error No. 7:
The Trial Court erred when, on or about June 24, 2016, it granted the Defendants' First Motion for Partial Summary Judgment.

Assignment of Error No. 8:
The Trial Court erred when, on or about August 11, 2016, it denied the Plaintiffs' Motion for Reconsideration.

Assignment of Error No. 9:
The Trial Court erred when, on or about August 23, 2016, it granted the Plaintiffs' Request for a Final Order.

Assignment of Error No. 10:
The Trial Court erred when, on or about January 5, 2017, it granted the Defendants' Second Motion for Summary Judgment.

**Law and Analysis**

**Assignments of Error Not Argued**

{¶44}  As an initial matter, we note that in their opening brief, appellants have only included separate argument relating to their seventh, eighth and tenth assignments of

error.  As to the remaining assignments of error, appellants simply "incorporate by reference their motions and briefs related to the same."  An appellant's brief must include "[a]n argument containing the contentions of the appellant *with respect to each assignment of error* presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."  (Emphasis added.)  App.R. 16(A)(7).  Pursuant to App.R. 16(A)(7), such arguments are to be presented within the body of the merit brief.  "[P]arties cannot simply incorporate by reference arguments that they made to the trial court in their appellate brief." *State ex rel. Midview Local School Dist. Bd. of Edn. v. Ohio School Facilities Comm.* 9th Dist. Lorain No. 16CA010991, 2017-Ohio-6928, ¶ 20, quoting *Deutsche Bank Natl. Trust Co. v. Taylor*, 9th Dist. Summit No. 28069, 2016-Ohio-7090, ¶ 14.  Where an appellant fails to comply with this rule, the appellate court may disregard the assignment of error.  App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).").  "If evidence, authority, and arguments exist that can support an assignment of error, it is not the duty of the appellate court to root it out." *Sutton v. Ohio Dept. of Edn.*, 2017-Ohio-105, 80 N.E.3d 1238, ¶ 35 (8th Dist.).  Likewise, although appellants mention a few of these other assignments of error — without any citation to legal authority — in their reply brief, we are not obliged to consider them.  Pursuant to App.R. 16(C), reply briefs are to be used to rebut arguments raised in the appellee's brief; an appellant may not use a reply brief to raise new issues or

assignments of error not addressed in the appellant's opening brief. *See, e.g., Harris v. Harris,* 5th Dist. Stark No. 2014CA00107, 2015-Ohio-1000, ¶ 39.

{¶45} Accordingly, we disregard and overrule appellants' first, second, third, fourth, fifth, sixth and ninth assignments of error for failure to comply with App.R. 16(A)(7). *See, e.g., Barry v. Rolfe*, 8th Dist. Cuyahoga Nos. 88459, 88460, 88676, 88680, 88681, 88682, 88683, 88684, 88685, 88686, 88908, 88909, 88910, 88911, 2008-Ohio-3131, ¶ 47-48 (overruling assignments of error where appellant, without providing any argument or supporting authority, simply incorporated motion filed below).

**Motions for Summary Judgment**

{¶46} Appellants' seventh, eighth and tenth assignments of error relate to the trial court's rulings on appellees' motions for summary judgment.

**Standard of Review**

{¶47} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate.

{¶48} Under Civ.R. 56, summary judgment is appropriate when no genuine issue as to any material fact exists and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶49} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to

summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.* Where there are no genuine issues of material fact, summary judgment is "an appropriate method by which to resolve a will contest." *Black v. Watson,* 8th Dist. Cuyahoga No. 103600, 2016-Ohio-1470, ¶ 7.

### Contest Claim

{¶50} In their seventh and eighth assignments of error, appellants contend that the trial court erred in entering summary judgment on their contest claim in favor of appellees, and thereafter denying their motion for reconsideration, because there are genuine issues of material fact as to whether appellants exerted undue influence over Joyce.

### Presumption of Validity and Claims of Undue Influence

{¶51} When a will is admitted to probate, there is a presumption of validity, including that the testator was free from restraint. *Johnson v. Johnson*, 5th Dist. Stark No. 2016CA00184, 2017-Ohio-4153, ¶ 15, citing *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 64, 567 N.E.2d 1291 (1991); R.C. 2107.74. The burden of proving undue influence is on the party challenging the will. *Kryder v. Kryder*, 9th Dist. Summit No. 25665, 2012-Ohio-2280, ¶ 29.

{¶52} To establish undue influence, the challenging party must prove by clear and convincing evidence: (1) the testator was susceptible to undue influence, (2) another person had an opportunity to exert influence over the susceptible testator, (3) improper influence was exerted or attempted and (4) a result showing the effect of such influence. *Black*, 2016-Ohio-1470, at ¶ 11, citing *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962), and *Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, 905 N.E.2d 1246, ¶ 38 (8th Dist.). The same standard applies in establishing undue influence with respect to a trust. *See* R.C. 5804.06 ("A trust is void to the extent its creation was induced by fraud, duress, or undue influence. As used in this section, 'fraud,' 'duress,' and 'undue influence' have the same meanings for trust validity purposes as they have for purposes of determining the validity of a will."). "Clear and convincing evidence" is more than a preponderance of the evidence, but does not rise to the level of certainty required by the beyond a reasonable doubt standard in criminal cases. *See, e.g.*, *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986); *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 8. It is that measure or degree of proof that produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Haynes* at *id*. Because "the person who can give the best evidence is dead," most evidence of undue influence "will be circumstantial, leaving the factfinder to draw permissible inferences." *Redman v. Watch Tower Bible & Tract Soc. of Pennsylvania*, 69 Ohio St.3d 98, 102, 630 N.E.2d 676 (1994).

**{¶53}** In *Black*, this court explained what is and is not undue influence sufficient to invalidate a will as follows:

> The mere existence of undue influence or an opportunity to exercise it, even coupled with an interest or motive to do so, is not sufficient to invalidate a will. [*West* at 501.] Rather, the influence must be actually exerted in the mind of the testator with respect to the execution of the will at issue. *Id.* That is, it must be shown that the undue influence resulted in the making of testamentary dispositions that the testator otherwise would not have made. *Id.*

*Black* at ¶ 11. "'The fact that the testator * * * disposes of his property in an unnatural manner, unjustly, or unequally, and however much at variance with expressions by the testator concerning relatives or the natural objects of his bounty, does not invalidate the will, unless undue influence was actually exercised on the testator.'" *West* at 502, quoting 94 Corpus Juris Secundum, 1074, at Section 224. "General influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will. If the will or codicil, as finally executed, expresses the will, wishes and desires of the testator, the will is not void because of undue influence." (Emphasis omitted.) *West* at 501.

**{¶54}** In this case, there is no evidence that Joyce had any diminished mental or physical capacity or had any significant health issues as of December 2010 when she executed her 2010 estate plan. The evidence presented by both parties showed that as of December 2010, Joyce was in good health, astute, intelligent, independent and took care of her own needs.[11] Although Joyce retained various advisors to assist her with

---

[11]Although Jim testified that when his mother visited him in May 2010 she told him that she was "physically and mentally beat to a crisp" and that she looked

financial, legal and business matters, the record reflects that she generally made her own decisions.

{¶55} However, undue influence is presumed if the challenging party establishes that a fiduciary or confidential relationship existed between the decedent and a beneficiary. *See, e.g., In re Estate of Kiefer*, 2d Dist. Miami No. 2016-CA-12, 2017-Ohio-6997, ¶ 8; *Diamond v. Creager*, 2d Dist. Montgomery No. 18819, 2002 Ohio App. LEXIS 844, at *9-*10 (Mar. 1, 2002). Where such a relationship exists, "'the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee.'" *Bayes v. Dornon*, 2015-Ohio-3053, 37 N.E.3d 181, ¶ 48 (2d Dist.), quoting *Studniewski v. Krzyzanowski*, 65 Ohio App.3d 628, 632, 584 N.E.2d 1297 (6th Dist.1989).

{¶56} Appellants contend that the evidence establishes that Josh and Kim had a confidential or fiduciary relationship with Joyce, giving rise to a presumption of undue influence, based on the fact that (1) Kim was an attorney-in-fact for Joyce and an authorized user or signer on certain of Joyce's bank and credit card accounts, (2) Josh assisted Joyce with her financial affairs and communicated with her estate planning

---

"horrible" and unhealthy, there is no evidence that Joyce was in such a state six months later when she executed the 2010 estate plan. To the contrary, appellees presented evidence that days before she executed the 2010 estate plan, Joyce underwent a medical examination in connection with an application for life insurance. The report from that examination indicates that Joyce was active with no major health concerns and that she had no "cognitive issues" or "deficits." Likewise, Murman's inaccurate and demeaning depiction of Joyce in his affidavit and expert report as "an elderly widowed woman" who was "not qualified to design an estate plan to take into account her many business and family interests" and "completely dependent upon [her] attorneys for independent and sound advice" regarding the distribution of her estate is not supported by the record.

attorneys on her behalf and (3) Josh and Kim were "constantly around" Joyce and "incessantly communicating" with her. They further contend that this "shifted the burden" to appellees to disprove that Joyce's 2010 estate plan was the product of undue influence, precluding summary judgment.

**{¶57}** A "fiduciary relationship" is a relationship in which "'special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Ryerson v. White*, 8th Dist. Cuyahoga No. 100547, 2014-Ohio-3233, ¶ 18, citing *Landskroner v. Landskroner*, 154 Ohio App.3d 471, 2003-Ohio-5077, 797 N.E.2d 1002, ¶ 32 (8th Dist.); *see also In re Estate of Kiefer* at ¶ 8. The holder of a power of attorney has a fiduciary relationship with his or her principal and is not required to have used the power of attorney for a confidential or fiduciary relationship to arise. *In re Estate of Kiefer* at ¶ 12; *Bayes*, 2015-Ohio-3053, at ¶ 48, 50.

**{¶58}** A "confidential relationship" exists "'whenever trust and confidence is placed in the integrity and fidelity of another.'" *Ryerson* at ¶ 19, quoting *Golub v. Golub*, 8th Dist. Cuyahoga No. 97603, 2012-Ohio-2509, ¶ 33; *Ament*, 180 Ohio App.3d 440, 2009-Ohio-36, 905 N.E.2d 1246, at ¶ 39. "A confidential relationship can be moral, social, domestic, or merely personal in nature." *Diamond* at *9, citing *Thorp v. Cross*, 11th Dist. Portage No. 97-P-0079, 1998 Ohio App. LEXIS 4885 (Oct. 16, 1998). The determination of whether a relationship is a confidential relationship is a question of fact dependent upon the circumstances in each case. *See, e.g., Ryerson* at ¶ 19; *Ciszewski v. Kolaczewski*, 9th Dist. Summit No. 26508, 2013-Ohio-1765, ¶ 10.

{¶59} Where a presumption of undue influence arises based on the existence of a confidential or fiduciary relationship between a donor and a beneficiary, "the burden of going forward with evidence" shifts to the beneficiary accused of exercising undue influence to show that his or her conduct was free from undue influence. *Landin v. Lavrisiuk*, 8th Dist. Cuyahoga No. 84893, 2005-Ohio-4991, ¶ 23; *Ryerson* at ¶ 17. The beneficiary may rebut the presumption by demonstrating that the donor acted voluntarily, in an exercise of his or her free will, with a full understanding of his or her actions and their consequences. *See, e.g., In re Guardianship of Simmons*, 6th Dist. Wood No. WD-02-039, 2003-Ohio-5416, ¶ 26. "[T]he party attacking the transfer retains the ultimate burden of proving undue influence by clear and convincing evidence." *Ament at* ¶ 38, 40; *In re Estate of Eyrich*, 11th Dist. Trumbull No. 2016-T-0002, 2016-Ohio-7165,¶ 25, quoting *Estate of Niemi v. Niemi*, 11th Dist. Trumbull No. 2008-T-0082, 2009-Ohio-209; *see also* Evid.R. 301 ("'In all civil actions * * * a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift the burden to such party in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast.").

{¶60} A parent-child relationship in and of itself is insufficient to create a confidential or fiduciary relationship. *See, e.g., Ryerson*, 2014-Ohio-3233, at ¶ 18; *Ciszewski*, 2013-Ohio-1765, at ¶ 10; *see also Jeffreys v. Dennis*, 5th Dist. Guernsey No. 96CA25, 1996 Ohio App. LEXIS 6122, *4, *7 (Dec. 2, 1996) (indicating that to support a presumption of undue influence between a parent and a child, a confidential or fiduciary

relationship must exist "separate and apart" from the parent-child relationship). However, in this case, there was evidence of more than a mere parent-child relationship between Joyce and Kim and Joyce and Josh.

**Kim's Relationship with Joyce**

{¶61} With respect to Kim, it is undisputed that Kim was her mother's attorney-in-fact for a number of years before Joyce executed her 2010 estate plan. Because Kim was her mother's attorney-in-fact, a fiduciary relationship existed between Kim and Joyce at the time she executed her 2010 estate plan, giving rise to a presumption of undue influence by Kim. Thus, the issue is whether Kim successfully rebutted the presumption of undue influence. We believe that there is no genuine issue of material fact that she did so.

{¶62} Viewing the evidence presented in the light most favorable to appellants, it could not support a finding that any influence Kim may have exerted over Joyce "so overpower[ed] and subjugate[d]" Joyce "as to destroy [her] free agency and make [her] express [Kim's] will rather than [her] own" with respect to her estate plan. *West,* 173 Ohio St. 498, 501, 184 N.E.2d 200 at 501. In this case, although Kim was Joyce's attorney-in-fact and had access to certain of Joyce's bank and credit card accounts, there was no evidence she used them to benefit herself. Likewise, although Kim may have spent a lot of time with, and communicated frequently with, her mother, there is no evidence that these communications related to her estate plan or that Kim exerted any influence — much less undue influence — over Joyce with respect to her estate plan. The record reflects that Kim accompanied her mother on a couple of meetings with her

attorneys to discuss estate planning and the possible buyout of Kim's and Joyce's shares in the companies, but there is no evidence from which it could be reasonably inferred that Kim was involved in or directing any decisions related to Joyce's 2010 estate plan.

**Josh's Relationship with Joyce**

{¶63} Josh's actions are more troublesome. The record reflects that beginning in August 2010, Josh was regularly involved in and, in many instances, was the exclusive conduit for, communications between Joyce and her estate planning attorneys. After Gross was removed as the contact for Joyce's estate plan, virtually every communication with her attorneys relating to Joyce's new estate plan and Joyce's intent with respect to that estate plan went through or included Josh. Other than Gariepy's assumption that he did so based on years of practice and "protocol," there is no evidence that Gariepy had any direct, independent communications with Joyce confirming that what Josh had told him — and what was ultimately included in the 2010 estate plan — accurately reflected Joyce's intent. Gariepy could not recall what communications he had with Joyce and his billing records do not reflect any meetings or other communications with Joyce regarding her estate plan that did not include Josh. Further, it is questionable whether Joyce even received a number of the communications Gariepy sent her. It was undisputed that Joyce "didn't do email." Whereas Gross and Baptiste testified that they generally communicated with Joyce by mail, federal express, telephone or in person, Gariepy's communications with Joyce were primarily by email or fax.

{¶64} Based on Josh's role as intermediary and spokesperson for his mother with respect to her 2010 estate plan, we believe reasonable minds could disagree as to whether

Josh had a confidential relationship with Joyce that would entitle appellants to a presumption of undue influence by Josh. Although there is evidence in the record upon which this presumption could potentially be rebutted, we find that genuine issues of fact exist with respect to whether Josh's relationship with Joyce was free of undue influence and whether Joyce acted voluntarily, with full knowledge and understanding of her actions and their consequences, in executing her 2010 estate plan. Accordingly, the probate court erred by not affording appellants the opportunity to litigate the presumption of undue influence in granting summary judgment on the contest claim. *See, e.g., Sigler v. Burk*, 3d Dist. Crawford No. 3-16-19, 2017-Ohio-5486, ¶ 86-90.

{¶65} We sustain appellants' seventh assignment of error. Given that a genuine issue of material fact exists as to the validity of the 2010 estate plan, a genuine issue of material fact likewise exists as to whether appellants have standing to assert their removal claim. Accordingly, we also sustain appellants' tenth assignment of error.

{¶66} Given our resolution of appellants' seventh assignment of error, appellant's eighth assignment of error is moot. We reverse the probate court's granting of summary judgment on the contest and removal claims and remand the matter to the trial court for further proceedings consistent with this opinion.

{¶67} Judgment reversed; remanded.

It is ordered that appellants recover from appellees the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to Cuyahoga County Court of Common Pleas, Probate Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
LARRY A. JONES, SR., J., CONCUR