AMENT, Trustee, Appellant and Cross-Appellee,

v.

REASSURE AMERICA LIFE INSURANCE COMPANY
et al., Appellees and Cross-Appellants.

[Cite as *Ament v. Reassure Am. Life Ins. Co.,* 180 Ohio App.3d 440, 2009-Ohio-36.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 91185.

Decided Jan. 8, 2009.

442

Benesch, Friedlander, Coplan & Aronoff L.L.P., Tamara L. Karel, and Eric Larson Zalud, for appellant and cross-appellee.

Hohmann, Boukis, & Curtis Co., L.P.A., and Christ Boukis, for appellee and cross-appellant Reassure America Life Insurance Company.

John M. Manos Co., L.P.A., and John M. Manos, for appellee and cross-appellant Young Hee Shin Kim.

CHRISTINE T. MCMONAGLE, Judge.

{¶ 1} Plaintiff-appellant, Dr. Albert Ament, as trustee of a trust agreement between him and his now deceased wife, Dr. Kyung H. Kim, sued his wife's younger sister, Young Hee Shin Kim ("Young Hee").[1] Dr. Ament alleged that Young Hee and his cousin, Theresa Stebbins, had caused his wife, through undue influence, fraudulent concealment, and fraudulent inducement, to change the beneficiary designation on a $500,000 life insurance policy from Ament, as trustee, to Young Hee. He sought a declaratory judgment that he was the rightful beneficiary. The jury found that Young Hee was the rightful beneficiary, and the trial court entered judgment accordingly.

{¶ 2} Ament now appeals from the trial court's judgment. He contends that the trial court allowed inadmissible hearsay at trial, gave the jury an incorrect instruction regarding undue influence, and abused its discretion in not allowing his counsel to treat Theresa Stebbins, one of the witnesses at trial, as a hostile witness.

{¶ 3} Young Hee cross-appeals. She argues that any errors at trial were harmless, as the trial court should have granted her motion for summary judgment. She further contends that the trial court erred in granting Ament's motion to dismiss her counterclaim for tortious interference with contract.

## I. Background

{¶ 4} Dr. Kim was the oldest daughter in a traditional Korean family. She immigrated to the United States and became a successful radiologist.

{¶ 5} Dr. Kim and Dr. Ament, also a radiologist, married in 1979. Their daughter, Andrea, was born in 1982. In 1986, they established reciprocal wills and trusts to provide for the surviving spouse and Andrea upon either spouse's death. This trust agreement was never changed.

{¶ 6} In 1987, Drs. Ament and Kim each purchased $500,000 whole–life insurance policies that respectively designated the other, as trustee, as beneficiary. In 1993, Dr. Kim purchased a $500,000, 15–year term life insurance policy (the policy at issue in this case) designating Ament, as trustee, as beneficiary. In 1996, Dr. Kim purchased another $500,000 15–year term life insurance policy, this time designating Ament, individually (not as trustee), as the beneficiary. Accord-

---

1. Ament also sued Reassure America Life Insurance Company, which issued the insurance policy to Dr. Kim, to enjoin Reassure from releasing the policy proceeds to Young Hee. Reassure subsequently deposited the funds with the court and was dismissed from the suit.

ing to Dr. Ament, this policy was designed to cover any shortfall if death occurred before they reached their $5 million dollar retirement goal.

{¶ 7} Dr. Ament managed the family's investments. According to Dr. Ament, as of 2003, in addition to the $1 million of life insurance Dr. Kim had purchased on his behalf, his investment account was worth $1.5 million, Dr. Kim's account totaled $1.3 million, and Andrea's account totaled $180,000. In addition, he and Dr. Kim owned a home in Gates Mills, Ohio, on 6.5 acres, worth $1.8 million,[2] a 3½ acre plot of land in Gates Mills worth $150,000, and a farm in Newbury, Ohio, worth approximately $600,000.

{¶ 8} Dr. Ament stopped working in 1993, after his contract with his employer was not renewed. Until her death in 2005, Dr. Kim's income supported Dr. Ament and Andrea, and Dr. Kim's younger sister Young Hee and Young Hee's son, Charlie.

{¶ 9} Young Hee, her husband, and Charlie immigrated to the United States in 1992 and stayed with Dr. Kim's family for several months. Young Hee worked for Dr. Kim, cooking, cleaning, and helping out with household chores and errands. After Young Hee's husband abandoned the family, Dr. Kim paid Young Hee between $15,000 and $20,000 annually for her assistance.

{¶ 10} Despite Dr. Ament's assertion to the contrary, Dr. Kim apparently made many financial decisions without her husband's approval. Dr. Ament testified that she always maintained her own checking account and did not tell him how much she was paying Young Hee, although he admitted he always felt that she was paid too much. Without her husband's knowledge, Dr. Kim served as financial sponsor for Young Hee and her family, as well as another sister and brother, so they could immigrate to the United States. Once her siblings were in the United States, Dr. Kim provided financial support to them, including cosigning for their apartment leases and home mortgages, again without Dr. Ament's knowledge.

{¶ 11} In January 2000, Dr. Kim was diagnosed with breast cancer. After chemotherapy and radiation, she returned to work cancer free. The cancer recurred in May 2004, however, and Dr. Kim again began receiving treatments.

{¶ 12} In August 2004, Dr. Kim asked Dr. Ament's cousin, Theresa Stebbins, for the name of an estate attorney. Stebbins referred Dr. Kim to her attorney, Christ Boukis, who met with Dr. Kim at her home and discussed with her how her estate plan was structured. Boukis testified that Dr. Kim was "very intelligent and knowledgeable" about her plan and was well aware of the assets

---

2. Dr. Ament contended that as of 2005, the house was "essentially worthless" because it was sliding down the hill it was built on.

included in her estate. Dr. Kim subsequently called Boukis in the spring of 2005 and asked him to confirm ownership of the Gates Mills house, lot, and Newbury farm. Boukis told Dr. Kim that the house and lot were owned by Dr. Ament, and the farm was held in a joint tenancy with her husband, so those assets would go to her husband upon her death.

{¶ 13} Stebbins, who was present during Dr. Kim's meeting with Boukis, testified that after Boukis left, she asked Dr. Kim whether there were funds for Andrea's medical education, and Dr. Kim confirmed that $80,000 had been set aside for that purpose. Stebbins then asked Dr. Kim whether she was making any special provision for her daughter. Dr. Kim paused, and then told Stebbins, "No, her father loves her so much he will take care of her." After another pause, Dr. Kim told Stebbins that she had three insurance policies and planned to leave one to her sister and the other policies, along with everything else they owned, to her husband.

{¶ 14} In August 2004, Dr. Kim and Stebbins went to Texas to visit a doctor who specializes in alternative, holistic medicine. Prior to the trip, Dr. Kim gave Stebbins $21,000 and asked her to set up a checking account from which Stebbins would pay the bills for the doctor's services. According to Stebbins, the bills were sent to her home because Dr. Kim did not want to be "harassed" by Dr. Ament, who did not want Dr. Kim spending money on alternative medical treatments. Stebbins also paid Boukis for his services from this account. At Dr. Kim's direction, Stebbins paid the money remaining in the account upon Dr. Kim's death (approximately $12,000) to Young Hee.

{¶ 15} In November 2004, Stebbins accompanied Dr. Kim on a trip to Pennsylvania. During that trip, Stebbins asked Dr. Kim, "Are your ducks in order?" Dr. Kim told Stebbins that she had not yet had "time to take care of it." Stebbins testified that she never discussed Dr. Kim's estate plan with her after that trip. Stebbins did not know the amount of the policy Dr. Kim planned to leave to Young Hee, and Dr. Kim never told Stebbins that she had changed the beneficiary on the policy.

{¶ 16} Dr. Kim continued with chemotherapy treatments through the summer of 2005. According to Dr. Ament, Dr. Kim suffered from a condition he called "chemo brain," which, according to Dr. Ament, causes a person to become susceptible to the influences of others. Dr. Ament testified that Dr. Kim's new medications, including steroids, also caused "psychological changes and rage reactions." He testified that she would take sleeping pills because she had trouble sleeping, but then "couldn't function the following day."

{¶ 17} Despite her cancer, Dr. Kim continued to travel and work. In May 2005, she traveled to South Bend, Indiana for Andrea's college graduation ceremony, and in June 2005, she traveled to Boston for a three-day seminar about

magnetic resonance imaging. In August 2005, Dr. Ament, Andrea, and Dr. Kim went on a two-week cruise to Alaska. Dr. Kim also worked three days a week throughout the summer of 2005. Dr. Ament agreed that Dr. Kim "looked impeccable" every time she went to work, and Dr. Susan Miller, who worked with Dr. Kim, testified that she was not aware during that summer that Dr. Kim was sick again. Dr. Miller testified that she "absolutely" did not observe any changes in Dr. Kim's work during this time that would suggest she was on any mind-altering drugs. She testified further that Dr. Kim was an extremely strong-willed woman.

{¶ 18} Andrea, who was home that summer caring for her mother, testified that Dr. Kim was tired and getting worse during the summer, "but she was still holding herself together and working." According to Andrea, her mother and Young Hee had an extremely close relationship, and Young Hee "was always there" for her mother. Andrea testified further that she did not believe that Young Hee would do anything to harm her (Andrea) and that her mother was "not forced to do anything."

{¶ 19} Dr. Ament testified that although Dr. Kim relied on Young Hee for emotional support and companionship, during the summer of 2005, he banished Young Hee from the house, because she told him that she wished he were dead. Dr. Ament told Young Hee that she could not return until she apologized to him, which Young Hee refused to do. To care for her sister, Young Hee would leave meals for her by the garage door or bring them to her while she was working.

{¶ 20} Yun Hee Park, Dr. Kim's insurance agent, testified that in June 2005, Dr. Kim called her and told her that she wanted to change the beneficiary on her life insurance policy. A few weeks later, Dr. Kim called Park again, because she had not received the change of beneficiary form. The agency sent the form to Dr. Kim on July 1, 2005; Dr. Kim completed and returned the form on July 4, 2005.

{¶ 21} Shortly thereafter, Dr. Kim visited Park's Korean food store. Park testified that Dr. Kim did not appear fatigued, confused, or depressed that day, and Park did not even realize that she was sick. In response to Park's question, Dr. Kim told her that the new beneficiary on the policy was her sister, Young Hee. Park was not surprised because in Korean families, the eldest sibling is expected to provide for the younger siblings. When Park asked Dr. Kim why she had not included her other sister as a beneficiary, Dr. Kim told her that Young Hee did not have a husband, house, or money like the other sister. Dr. Kim also told Park that Young Hee did not know that she had made her the beneficiary, and Park was the only person she had told of the change. Park testified that she never told anyone about the beneficiary change and that Young Hee never asked her about it.

{¶ 22} Young Hee testified that in mid-September 2005, before entering the hospital for surgery, Dr. Kim gave her an envelope that contained the change of beneficiary form, a letter from the insurance company confirming the change, and a receipt showing payment of the premium for that year. Dr. Kim told Young Hee that she had made her the beneficiary on her policy and told Young Hee to keep the envelope in a safe place. Young Hee did not ask Dr. Kim the amount of the insurance and never spoke with her sister again about insurance. Before she entered the hospital a second time in the fall of 2005, Dr. Kim gave Young Hee another envelope that contained the family's immigration papers. After Dr. Kim's death, Young Hee discovered that the insurance policy on which she had been named beneficiary was also in the envelope.

{¶ 23} Dr. Kim died on December 1, 2005, due to complications from surgery. After her death, Dr. Ament was "devastated" to learn that Dr. Kim had made Young Hee the beneficiary of the policy. According to Dr. Ament, Dr. Kim "would have never done this without [Young Hee's and Stebbins's] undue influence." He contended that Dr. Kim's fragile mental and emotional state, caused by her cancer and the drugs she was taking to treat the disease, had made her especially susceptible to Young Hee's and Stebbins's influence.

## II. Inadmissible Hearsay?

{¶ 24} Prior to trial, Dr. Ament filed a motion in limine to exclude hearsay statements of Dr. Kim made to any witnesses who would testify at trial. The trial court denied Dr. Ament's motion during trial.

{¶ 25} Generally, hearsay—an out-of-court statement offered by another to prove the truth of the matter asserted—is inadmissible at trial unless provided for by the Rules of Evidence. Evid.R. 801 and 802. In his first assignment of error, Dr. Ament complains that the trial court erred in denying his motion and allowing Theresa Stebbins, Park, and Boukis to testify regarding what Dr. Kim told them. He contends that their testimony was inadmissible hearsay barred by Evid.R. 804(B)(5).

{¶ 26} The admission of evidence is generally within the discretion of the trial court, and a reviewing court may reverse only upon the showing of an abuse of that discretion. *Kozak v. Jackson*, 8th Dist. No. 88851, 2008-Ohio-50, 2008 WL 97918, ¶ 30, citing *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290. The term "abuse of discretion" connotes more than an error of law or judgment; it implies an attitude that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 27} The first statement Dr. Ament complains of is Dr. Kim's statement to Park explaining why she designated Young Hee, and not her other sister, as

beneficiary of one of the insurance policies. We find that it was not error to admit this statement, because Evid.R. 803 provides an exception for statements of the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, *motive*, design * * *)." (Emphasis added.) Insofar as Dr. Kim's statement to Park was admitted to explain Dr. Kim's motive in designating Young Hee, and not her other sister, as beneficiary, it constitutes an exception under Evid.R. 803 to the hearsay rule.

{¶ 28} Dr. Ament next complains that attorney Boukis's testimony that Dr. Kim was aware of the particular assets in her estate was inadmissible hearsay. But this testimony was not hearsay at all, insofar as it was not admitted for the truth of the statement (what assets were in the estate), but rather as evidence of Dr. Kim's knowledge of her estate and issues involving asset transfer upon death and her general mental competence.[3]

{¶ 29} Finally, Dr. Ament objects to Stebbins's testimony that Dr. Kim told her she intended to grant the proceeds of one insurance policy to her sister, and the other policies, plus the balance of her estate, to her husband. Again, this statement falls under Evid.R. 803. As discussed above, a statement of the declarant's "then existing state of mind * * * (such as intent, plan, motive, design * * *)" constitutes an exception to the hearsay rule. Dr. Kim's statement, as testified to by Stebbins, was clearly a statement of Dr. Kim's *intent* in granting the proceeds of one insurance policy to her sister, Young Hee.

{¶ 30} Dr. Ament argues that because Dr. Kim is deceased, the only way to introduce hearsay statements in this case was by way of Evid.R. 804(B)(5), which provides that a hearsay statement of a deceased person is not excluded by the hearsay rule where (1) the estate or personal representative of the estate is a party, (2) the statement was made before the decedent's death, and (3) the statement is offered to "rebut testimony by an adverse party on a matter within the knowledge of the decedent." Evid.R. 804(B)(5). Dr. Ament argues further that under the rule, only he could introduce Dr. Kim's hearsay statements in rebuttal. Dr. Ament's arguments fail, however, because the court need consider Evid.R. 804(B)(5) only if, after an analysis of Evid.R. 801 and 803, the objected-to statements appear to be inadmissible hearsay. Here, as discussed above, the statements Dr. Ament complains of are either not hearsay at all or are admissible hearsay under Evid.R. 803 (which specifically provides that the availability of the declarant is immaterial). Accordingly, Evid.R. 804(B)(5) is not applicable.

---

3. Surely, had attorney Boukis testified that Dr. Kim seemed to be confused, and/or was unfamiliar with the nature of the assets in her estate, such testimony would be admissible to prove her general incompetence or unusual vulnerability to undue influence.

{¶ 31} Finally, we note that while we do not find any of the complained-of statements to constitute prohibited hearsay, even if they were, any error in their admission was harmless, as Dr. Ament failed to produce any evidence whatsoever to support his claim of undue influence. See, e.g., *Kozak*, 2008-Ohio-50, 2008 WL 97918, at ¶ 34.

{¶ 32} Accordingly, appellant's first assignment of error is overruled.

### III. Jury Instructions

{¶ 33} Prior to trial, both parties submitted proposed jury instructions. Dr. Ament's proposed jury instruction regarding undue influence included the following language:

{¶ 34} "If you find that a confidential relationship did exist between Kyung Kim and Young Hee Shin Kim or between Kyung Kim and Theresa Stebbins, a presumption of undue influence arises and the burden of going forward with evidence shifts to the Defendant Young Hee Shin Kim to show that her conduct and the conduct of Theresa Stebbins was free of undue influence or fraud and that Kyung Kim acted voluntarily and with a full understanding of her act and its consequences. Young Hee Shin Kim must rebut this evidence presumption with a preponderance of the evidence."

{¶ 35} The trial court did not include the proposed language in its instruction and instructed the jury in accordance with Ohio Jury Instructions Section 363.05 regarding undue influence.

{¶ 36} In his second assignment of error, Dr. Ament argues that the trial court erred in not including his proposed jury instruction, because the instruction on undue influence, as given, does not comport with the law.

{¶ 37} A trial court's decision on jury instructions is treated with deference, and an appellate court will not reverse absent an abuse of discretion. *Jaworowski v. Med. Radiation Consultants* (1991), 71 Ohio App.3d 320, 327–328, 594 N.E.2d 9. To show reversible error, the proponent of the error must show both that the trial court's refusal to give the instruction was an abuse of discretion and that he was prejudiced by the court's refusal to give the proposed instruction. Id. Thus, this court will not reverse unless an instruction is so prejudicial that it may induce an erroneous verdict. *Youssef v. Parr* (1990), 69 Ohio App.3d 679, 691, 591 N.E.2d 762.

{¶ 38} When a confidential or fiduciary relationship exists between a donor and donee, the transfer is looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee. *Willis v. Baker* (1906), 75 Ohio St. 291, 79 N.E. 466. In such circumstances, a presumption arises that the transfer is invalid, and the burden of going forward with

evidence shifts to the transferor to demonstrate the absence of undue influence, but the party attacking the transfer retains the ultimate burden of proving undue influence by clear and convincing evidence. Id.; *Bobko v. Sagen* (1989), 61 Ohio App.3d 397, 408, 572 N.E.2d 823; *Hardy v. Fell,* 8th Dist. No. 88063, 2007-Ohio-1287, 2007 WL 853302, ¶ 8.

{¶ 39} A confidential relationship exists whenever trust and confidence are placed in the integrity and fidelity of another. *Thorp v. Cross* (Oct. 16, 1998), 11th Dist. No. 97–P–0079, 1998 WL 35264418. Here, Dr. Ament produced evidence that Young Hee and Dr. Kim were in a confidential relationship. Nevertheless, the trial court was justified in not giving the requested instruction, as it might have been misleading to the jury.

{¶ 40} "In all civil actions * * * a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift [the burden] to such party * * * in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast." Evid.R. 301. In short, a presumption is not evidence and does not switch the burden of proof; it affects only the burden of going forward with evidence.

{¶ 41} Here, the only evidence was that there was *no* undue influence, the defense having sustained its burden of going forward and Dr. Ament having produced no evidence whatsoever of undue influence. To instruct the jury to presume undue influence, despite the total lack of such evidence, would have been prejudicial error. See, e.g., *Erdman v. Mestrovich* (1951), 155 Ohio St. 85, 44 O.O. 97, 97 N.E.2d 674 (holding that when there is no evidence to support an issue, no charge should be given thereon).

{¶ 42} Dr. Ament's testimony that Dr. Kim suffered from "chemo brain," experienced "psychological changes," and had trouble completing a check shortly before making the beneficiary change is, at best, minimal evidence of incompetency, not undue influence.[4]

{¶ 43} In *West v. Henry* (1962), 173 Ohio St. 498, 501–502, 20 O.O.2d 119, 184 N.E.2d 200, the Ohio Supreme Court discussed, in the context of a will contest, what is and is not undue influence:

---

4. On the other hand, there is voluminous evidence in the record of Dr. Kim's competence around the time of the beneficiary change: she continued to work as a radiologist during the summer of 2005, and her colleagues did not know she was sick again, she dressed impeccably, she continued to handle the family's finances, and she traveled with her family. The record also reflects that Dr. Kim's reasons for financially protecting her sister after her death were sound.

{¶ 44} "General influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will. If the will or codicil, as finally executed, expresses the will, wishes and desires of the testator, the will is not void because of undue influence.

{¶ 45} "The mere existence of undue influence or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient, but such influence must be actually exerted on the mind of the testator with respect to the execution of the will in question. It must be shown that such influence, whether exerted at the time of the making of the will or prior thereto, was operative at the time of its execution or was directly connected therewith. It must be shown that undue influence was exercised with the object of procuring a will in favor of particular parties.

{¶ 46} "The fact that the testator * * * disposes of his property in an unnatural manner, unjustly, or unequally, and however much at variance with expressions by the testator concerning relatives or the natural objects of his bounty, does not invalidate the will, unless undue influence was actually exercised on the testator." Id.

{¶ 47} Although Dr. Ament may have been "devastated" by Dr. Kim's action in making Young Hee the beneficiary of one of the life insurance policies, there is no evidence in the record that Young Hee improperly influenced her to do so. Despite Dr. Ament's delusions of conspiracies against him, the uncontraverted evidence is that Young Hee was not aware of the change until after it had been made and was not aware of the amount of the policy until after Dr. Kim's death. Further, the evidence established that Dr. Kim made financial decisions throughout her marriage without consulting her husband and that she made the beneficiary change only after careful consideration of how to provide for her sister, as well as her husband and daughter, after her death.

{¶ 48} Because of the lack of any evidence demonstrating undue influence, the trial court did not abuse its discretion in not giving Dr. Ament's proposed jury instruction and in limiting its instruction to the standard charge found in Ohio Jury Instructions.

{¶ 49} Appellant's second assignment of error is overruled.

**IV. Adverse Witness**

{¶ 50} During trial, Dr. Ament's counsel advised the court that it intended to call Theresa Stebbins as an adverse witness in its case-in-chief. After questioning, the trial judge ruled that counsel had not demonstrated that she was adverse and that counsel could not cross-examine Stebbins or ask leading questions of her during his case-in-chief. In his third assignment of error, Dr. Ament contends

that the trial court committed prejudicial error by not allowing him to treat Stebbins as an adverse witness.

{¶ 51} To prevail on this claim, Dr. Ament must demonstrate that the trial court abused its discretion when it ruled that counsel could not cross-examine Stebbins during his case-in-chief and that the abuse of discretion had a prejudicial effect on his case. *Moore v. Westfield Cos.* (May 29, 1992), 6th Dist. No. E–91–11, 1992 WL 113778.

{¶ 52} The record reflects that despite the trial court's ruling, counsel asked leading questions of Stebbins, none of which were objected to by defense counsel. Even after the trial judge admonished him, counsel continued asking leading questions. Stebbins answered every question put to her.

{¶ 53} Dr. Ament argues that he was not allowed to impeach Stebbins with prior inconsistent statements from her deposition, although the record reflects that he never attempted to impeach her during her testimony. Further, the record indicates that on the day following Stebbins's testimony, the trial judge told Dr. Ament's counsel that he would allow him to re-examine Stebbins if he could identify any questions he had been precluded from asking during his prior examination of her. Counsel could not identify any question he had not been allowed to ask.

{¶ 54} Accordingly, on this record, Dr. Ament has not sufficiently demonstrated that the trial court abused its discretion or that any prejudicial effect occurred as a result of the trial court's ruling.

{¶ 55} Appellant's third assignment of error is overruled.

## V.  Young Hee's Cross–Appeal

{¶ 56} Young Hee cross-appeals and asserts two assignments of error.

### A.  Motion for Summary Judgment

{¶ 57} She first contends that the trial court erred in denying her motion for summary judgment.

{¶ 58} Generally, any error in denying a motion for summary judgment is rendered moot if a subsequent trial on the same issues demonstrates genuine issues of fact supporting a judgment in favor of the party against whom the motion was made. *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615; *Donovan v. Omega World Travel* (Oct. 5, 1995), 8th Dist. No. 68251, 1995 WL 588721. We find, as did the jury, that the manifest weight of the evidence does not support a judgment in favor of Dr. Ament. However, although it found Dr. Ament's evidence "sketchy," the trial court denied Young Hee's motion for a directed verdict after the presentation of all the evidence and

allowed the case to go to the jury. Accordingly, this assignment of error is rendered moot, and we need not consider it.

### B. Dismissal of Young Hee's Counterclaim

{¶ 59} In her answer to the complaint, Young Hee asserted counterclaims for intentional infliction of emotional distress and tortious interference with contract. Dr. Ament filed a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim. The trial court granted the motion to dismiss Young Hee's counterclaim for tortious interference with contract.[5] In her second assignment of error, Young Hee contends that the trial court erred in dismissing this claim.

{¶ 60} When reviewing a judgment granting a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted, an appellate court must independently review the complaint to determine whether dismissal is appropriate. *CCI Properties v. McQueen*, 8th Dist. No. 82044, 2003-Ohio-3674, 2003 WL 21555324, ¶ 13, citing *McGlone v. Grimshaw* (1993), 86 Ohio App.3d 279, 285, 620 N.E.2d 935. The reviewing court need not defer to the trial court's ruling on such a motion. Id. Dismissal is appropriate only when it appears beyond a doubt that the complainant can prove no set of facts sufficient to support the asserted claim. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 521, 524, 668 N.E.2d 889. In construing the complaint when considering a Civ.R. 12(B)(6) motion, a court must presume all factual allegations contained in the complaint to be true and make all reasonable inferences in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753.

{¶ 61} A claim for tortious interference with contract requires proof that (1) a valid contract existed, (2) the defendant was aware of the existence of the contract, (3) the defendant intentionally procured a breach of the contract, (4) the defendant lacked justification for his conduct, and (5) the plaintiff suffered damages as a result of the defendant's conduct. *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863.

{¶ 62} Ohio courts recognize the defense of privilege to tortious interference with contract claims. "One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction." *Clauder v.*

---

5. Young Hee subsequently dismissed her counterclaim for intentional infliction of emotional distress.

*Holbrook* (Jan. 28, 2000), 1st Dist. No. C–990145, 2000 WL 98218, * 3, citing Restatement of the Law 2d, Torts (1979), Section 773.

{¶ 63} Such privilege may be overcome by "actual malice." *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 11, 651 N.E.2d 1283. Malice, as used in this context, denotes an unjustified or improper interference with the contractual relationship. *Hoyt v. Gordon & Assoc.* (1995), 104 Ohio App.3d 598, 604, 662 N.E.2d 1088. "Inherent in the concept of actual malice is the notion that a wrongful act has been done without any plausible legal justification." *Wagner–Smith Co. v. Ruscilli Constr. Co.*, 139 Ohio Misc.2d 101, 2006-Ohio-5463, 861 N.E.2d 612, ¶ 27.

{¶ 64} In her counterclaim, Young Hee alleged that Dr. Ament's lawsuit was a "malicious, baseless act intended to extort funds from Young Hee knowing that Young Hee lacks the funds and temperament to withstand protracted litigation." This allegation is insufficient to overcome Dr. Ament's privilege, as trustee, to protect the trust's interest in the insurance proceeds via a lawsuit. Accordingly, the trial court did not err in granting Dr. Ament's motion to dismiss Young Hee's counterclaim for tortious interference with contract. But given the total lack of evidence to support Dr. Ament's suit, Young Hee's allegation is appropriately addressed by the frivolous conduct provisions of R.C. 2323.51.

{¶ 65} Cross-appellant's second assignment of error is overruled.

Judgment affirmed.

CALABRESE, P.J., and SWEENEY, J., concur.