[Cite as *Haddad v. Maalouf-Masek*, 2022-Ohio-4085.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| TINA R. HADDAD, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 111409 |
| v. | : | |
| NINA M. MAALOUF-MASEK, ET AL., | : | |
| Defendants-Appellees. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 17, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Probate Division
Case No. 2019ADV248638

*Appearances:*

Haddad Law Office and Tina R. Haddad, *for appellant*.

Reminger Co., L.P.A., Adam M. Fried, and Timothy J. Gallagher, *for appellee*.

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Appellant, Tina R. Haddad ("Tina"), appeals from the jury's verdict in favor of appellee, Nina M. Maalouf-Masek ("Nina"), in a will-contest action challenging their deceased mother, Rosaline Haddad's ("Rosaline"), will that was executed on October 27, 2004 ("the 2004 will"). Tina argues that the Cuyahoga

County Court of Common Pleas, Probate Division, erred in reciting an erroneous jury instruction, admitting hearsay evidence, and limiting the evidence produced at trial to the years 2000 through 2005. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 1} On June 5, 2019, at the age of 85, Rosaline died testate, leaving behind two daughters, Tina and Nina, as the sole heirs of her estate. Tina and Nina's father, who Rosaline divorced in 1994, was murdered in 1995. Rosaline and her former husband started a business, R-H Industries ("R-H"), that Tina currently operates. Tina and Nina received joint ownership interests in R-H after their father passed away. In 1999, Tina purchased Nina's ownership interest in the company for $1.2 million.

{¶ 2} Rosaline executed her first known will in 2000 ("the 2000 will"). The 2000 will disposed of all assets equally between Tina and Nina. The 2000 will named Nina as the executor and Tina as the alternate. On the same date, Rosaline executed a durable healthcare power of attorney, naming Nina as her attorney-in-fact. Both documents were prepared and notarized by attorney Anna Petronzio ("Petronzio").

{¶ 3} In 2004, Rosaline executed another will, also prepared and notarized by Petronzio. The 2004 will disposed all of Rosaline's assets to Nina except for a $5,000 bequest to Tina. The will also contained a clause ordering that anyone who contested the will would receive only $1. The 2004 will specified that if Nina

predeceased Rosaline, Nina's disposition under the will was allocated to Nina's two sons, Rafic Maalouf and Charbel Maalouf, Jr. Nina was named the executor; her two sons were listed as the alternates.

{¶ 4} At trial, Petronzio testified that she typically destroys her files after seven years, but she believes she kept Rosaline's because it included a disinheritance and she, in her career of nearly 30 years, had only drafted about five disinheritances. Petronzio read her notes to the jury, which stated, "Disinherit Tina Rose Haddad, $5,000. Has not spoken in two years. Trust-same as the will, 100 percent Nina. Intention to use the funds towards education. Banking and beneficiary letters 200-Nina Maalouf." (Tr. 517.)

{¶ 5} Both wills were deposited in the probate court, and both Tina and Nina testified that they were completely unaware of the 2004 will until it was admitted to probate after Rosaline died. According to the record, Rosaline did not engage in any further estate planning in her lifetime.

{¶ 6} In December 2019, Tina initiated a will-contest action, challenging the 2004 will as the product of undue influence and asserting that Rosaline lacked testamentary capacity to execute the 2004 will. In support of her undue-influence claim, Tina pertinently alleged that (1) Rosaline received over $2 million in her divorce settlement that was initiated in 1994; (2) Rosaline suffered from "serious health issues"; (3) Rosaline had limited ability to read and write in English; (4) Rosaline moved in with Nina in 1998 and remained there until she was placed in a nursing home; (5) Nina isolated Rosaline from Tina, "bad-mouthed" Tina,

prohibited Rosaline from seeing Tina, and threatened to take Rosaline's grandchildren away if she associated with Tina; (6) Nina controlled "almost every aspect of her mother's life," including all of Rosaline's finances, emails, letters, and communications; (7) despite Nina's threats, Rosaline maintained contact with Tina between 2001-2009; (8) Nina's control over Rosaline's bank accounts included transferring some of Rosaline's bank accounts into joint and survivorship bank accounts with Nina; (9) "sometime between 2012 and 2017," Rosaline had dementia which had gotten so bad that she could no longer drive and was exclusively dependent on Nina; and (10) from 2012 through 2017, Nina wrote numerous checks payable to cash from her joint and survivorship accounts with Rosaline.

{¶ 7} In support of her contention that Rosaline lacked testamentary capacity, Tina alleged that Rosaline suffered from strokes and heart ailments, mental health issues, dementia, and was "functionally illiterate."

{¶ 8} A jury trial commenced on March 7, 2022, and lasted four days.

{¶ 9} During Tina's case-in-chief, she gave an overview of the family history. Rosaline was born in Pennsylvania to Lebanese parents and went back to Lebanon briefly where she met her husband. The pair moved back to Cleveland, Ohio and began a business together, R-H. They had two twin daughters, Nina and Tina. Tina testified that her father was incredibly strict, and that often, her father and Rosaline would engage in intense fights that their uncle, Richard Zarzour ("Uncle Richard"), had to come over to deescalate. Tina eventually moved out of the house to attend law school at Ohio Northern University in 1987. When Rosaline initiated divorce

proceedings in 1994, their father fled back to Lebanon, abandoning the family business and taking all of the family money.

{¶ 10} After the divorce, Rosaline and Nina moved in together. Tina moved back home and assisted Rosaline and Nina with the family business. She also assisted Rosaline in recovering the money that their father fled with to Lebanon. From their father's estate, Tina and Nina received equal shares of R-H. The sisters ran the business together but eventually, Tina and Nina noticed that they were incompatible from a business perspective. This led to Tina purchasing Nina's ownership interest.

{¶ 11} Tina did not make all payments for Nina's interest in a timely manner because she "started getting new work and funding the new jobs and the new customers, and [she] got cash poor." (Tr. 143.) Nina hired an attorney to send collection letters to Tina, and the sister's relationship became very strained, to the point where they were only communicating through their attorneys. Tina was not permitted to call the house where Rosaline and Nina lived. Tina noted that Nina was a "yeller" and that she feared interacting with Rosaline because she did not want to get Rosaline in trouble with Nina. Tina testified that despite Nina's requests, Rosaline would still come to the shop and "hang out" because she had a good relationship with the R-H employees and wanted to see Tina. Rosaline kept in touch with Tina, but allegedly did so in secret. Rosaline retired from R-H in 2003 when her health "started getting worse" but Tina kept her on the company health insurance. Later in 2003, however, R-H experienced financial problems and sent a

letter to all employees, including Rosaline, explaining that their health insurance would be terminated.

{¶ 12} Nina and Tina rectified their relationship around 2005 when Tina sent an apology letter to Nina. Tina was thereafter invited to family gatherings.

{¶ 13} Tina indicated that throughout her life, Rosaline treated both daughters equally. Tina also noted that it is not customary in Lebanese culture to talk about estate planning. Tina was aware of the 2000 will only because Rosaline told her in 2000 that she prepared a will and that everything was split equally between Tina and Nina. After that, Tina did not discuss any further estate planning with Rosaline. She stated that she never had a bad relationship with Rosaline and that all of the tension was between her and Nina.

{¶ 14} During her case-in-chief, Tina called several other witnesses. Dr. Stephen Noffsinger ("Dr. Noffsinger") opined that the 2004 will could have been the result of undue influence, a conclusion he arrived at after reviewing Rosaline's medical records from 2000 to 2004. Dr. Noffsinger noted that a CAT scan of Rosaline's brain from November 10, 2003, showed mild atrophy, which could be associated with cognitive impairment. He also discussed how factors such as gender, advanced age, level of education, medical illnesses, marital status, emotional distress factors, and a testator's living situation are taken into account when determining whether a testator is susceptible to undue influence.

{¶ 15} Renee Zarzour ("Renee"), Uncle Richard's daughter and Rosaline's niece, testified that throughout her life, Rosaline treated Tina and Nina equally and

that she was unaware of any fighting or tension between Tina and Rosaline. She indicated that Rosaline communicated an intent to leave everything to both daughters equally.

{¶ 16} Alba Ayala ("Ayala"), a retired employee of R-H, testified that in 2002, Rosaline told Ayala that her will left her assets to Tina and Nina equally. She also testified that Nina did not want Rosaline to see Tina, but she did not know why. She testified that she never saw Tina and Rosaline fight or disagree.

{¶ 17} Sue David, another longtime retired employee of R-H, testified that she did not observe any tension between Rosaline and either of her daughters. She also recalled that Rosaline was very proud when she came back from executing her 2000 will and communicated that she left her assets to both daughters equally.

{¶ 18} Jack and Jacqueline Aude, former friends of Nina and Rosaline, testified that Nina is temperamental and controlling in nature and, at one time, put a hole in the ceiling at her home because she threw a chair. They also testified that they never saw Rosaline speak negatively about Tina.

{¶ 19} At the close of Tina's case-in-chief, Nina moved for a directed verdict on the lack of testamentary-capacity claim due to a lack of evidence and Tina agreed to drop the claim. Thereafter, the trial proceeded on just the claim that the 2004 will was the product of undue influence.

{¶ 20} Nina's defense presented evidence demonstrating that Rosaline was entirely independent throughout her life and unable to be controlled by Nina. Nina

also presented evidence demonstrating that Rosaline and Tina's relationship was incredibly strained.

{¶ 21} Father Andrew Harmon ("Harmon"), a pastor from Rosaline's church who had a close relationship with Rosaline, testified that sometimes Rosaline had negative things to say about Tina, but it was not a common topic of conversation.

{¶ 22} Suzanne Sabbagh ("Sabbagh"), a friend of Rosaline who had never met Tina and Nina, was unable to appear at trial. Her deposition video was played in its entirety for the jury. Sabbagh testified that Rosaline was often upset about her interactions with Tina. She also testified that Tina "pushed" Rosaline out of the family business after a fight.

{¶ 23} Jocelyn Haddad ("Jocelyn"), whose mother was Rosaline's cousin, testified that Rosaline was a feisty woman. She also testified that Rosaline feared Tina. She recalled an incident where Tina yelled at Rosaline and another incident where Rosaline slapped Tina. She also testified that Rosaline often did things and went places without Nina.

{¶ 24} Maggi Maalouf ("Maalouf"), Nina's ex-husband's wife, testified that Tina and Rosaline had a strained relationship. She also testified that she recalled an altercation at R-H where Rosaline slapped Tina and stated that Rosaline "pretty much disowned her at that time." (Tr. 577.) She stated that Nina was a caregiver to Rosaline, but Rosaline still did things on her own and was not helpless.

{¶ 25} Nina testified that she never forbade Rosaline from speaking to Tina and that she never threatened to take her children away from Rosaline.

{¶ 26} Nina's expert, Dr. Sherif Soliman ("Dr. Soliman"), countered Dr. Noffsinger's testimony stating that he did not believe that Rosaline was susceptible to undue influence. In concluding this, Dr. Soliman stated that he gave great weight to the testimony in the record and noted that the atrophy that Dr. Noffsinger found concerning did not necessarily point to cognitive impairment and had to be coupled with actual symptoms, which he did not believe existed.

{¶ 27} After closing arguments, the court instructed the jury. The jury deliberated for two hours and returned a verdict that the 2004 will was a valid will and was not the product of undue influence.

{¶ 28} Tina appealed, assigning three errors for our review.

1. The trial court erred to the prejudice of the appellant when it read confusing instructions to the jury on testamentary capacity that the court ordered purged from the jury instructions. The sole issue was whether there was undue influence and was this the true last will of the testator. The court then further erred in submitting to the jury written instructions that differed from the prior given verbal instructions to the jury contrary to R.C. 2315.01(A)(7). The confusion between the court's different verbal instructions and the written instructions is reversible error and requires a new trial on the issue of undue influence.

2. The trial court erred to the prejudice of appellant in allowing hearsay evidence under Evid. Rule 804(B)(5) that did not go to rebut any claim against the estate or against an adverse party. A will contest is an in rem, non-adversarial proceeding. *Hess v. Sommer*, 4 Ohio App.3d 281 (3d Dist. 1982). Since there was no adverse party, no adverse claim was asserted under R.C. 2117.06, and claims of rebuttal evidence were improper and prejudicial.

3. The court erred to the prejudice of appellant and abused its discretion in evidentiary rulings limiting the discovery and evidence at trial for undue influence to 2003-2005, where the evidence showed defendant Maalouf-Masek dissipated her

mother's assets, signed over joint accounts to herself, made numerous inter vivos transfers. Her other bad acts post 2005 were relevant to show a pattern, scheme of elder abuse.

## II. Law and Argument

## A. Jury Instructions

{¶ 29} In her first assignment of error, Tina argues that the trial court erred in giving a jury instruction stating that the parties stipulated that the testator was free from undue influence. Tina argues that this was highly prejudicial because the only issue before the jury was whether Rosaline's 2004 will was the product of undue influence.

{¶ 30} After the trial concluded, the trial court conferred with Tina's and Nina's counsel regarding the jury instructions. Because Tina dropped the claim pertaining to testamentary capacity, it was agreed that all jury instructions pertaining to testamentary capacity would be removed. After the trial court marked up the existing instructions, Nina's counsel retyped them before the charge was read to the jury. The instruction that Tina assigns as error was:

> THE COURT: Definition of formalities: The parties have stipulated that Rose Haddad's Will was signed in accordance with the required formalities.
>
> * * *
>
> I'm going to back up just a little bit. I told you I can't deviate from this. Under the "Formalities" there was an "or" that threw me. So under "Formalities," the parties have stipulated that the Will was signed in accordance with the required formalities. Those are that the testator must be 18 years of age or older; testator must be of sound mind and

memory; testator must be free from restraint; testator must be free from undue influence.

(Tr. 768-769.)

{¶ 31} After the trial court concluded its charge to the jury, Tina's counsel spoke to the trial court and noted that the trial court misspoke during the formalities instruction. Tina's counsel pointed out that Tina did not stipulate that Rosaline was free from undue influence. The following exchange occurred:

> [TINA'S COUNSEL]: I just don't want any confusion. Maybe we could just — I don't think there's any reason to draw more attention to it. Could we maybe —
>
> THE COURT: I can have him reprint that page without those lines.
>
> [TINA'S COUNSEL]: Could we? That was my suggestion.

(Tr. 788.)

{¶ 32} The paper instructions provided to the jury omitted the erroneous instruction.

{¶ 33} We review a trial court's decision on jury instructions for an abuse of discretion. *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 30 (8th Dist.), citing *State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 33. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse ""implies that the court's attitude is unreasonable, arbitrary or unconscionable."" *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211, ¶ 135, quoting *Blakemore v.*

*Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Jury instructions are reviewed in their entirety to determine if they contain prejudicial error. *State v. Fields*, 13 Ohio App.3d 433, 436, 469 N.E.2d 939 (8th Dist.1984). A single jury instruction may not be judged in artificial isolation but must be viewed in the context of the overall charge. *State v. Walton*, 8th Dist. Cuyahoga No. 90140, 2008-Ohio-3550, ¶ 129, citing *State v. Price*, 60 Ohio St.2d 136, 141, 398 N.E.2d 772 (1979).

{¶ 34} Nina suggests that the conversation that Tina's counsel had with the trial court immediately after the instructions was not a formal objection. However, it is long recognized that "'failure to timely advise a trial court of possible error, by objection *or otherwise*, results in [waiver] of the issue for purposes of appeal.'" (Emphasis added.) *Jones v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 107030, 2021-Ohio-1095, ¶ 28, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). Tina's counsel plainly brought the error to the court's attention, and with Tina's counsel's consent, the trial court elected to ignore the issue and not bring it to the jury's attention to avoid further confusion.

{¶ 35} A review of the jury instructions in their entirety reveals that the remainder of the instructions remedied any confusion that the contested instruction could have created. Immediately after the instruction was given, the trial court extensively explained undue influence:

> Issue, undue influence: The Plaintiff claims that Rose Haddad was unduly influenced at the time she executed her Will on October 27, 2004 and, therefore, the Will is not valid and should be set aside. You

must decide if there is clear and convincing evidence that Rose Haddad was unduly influenced on October 27, 2004.

(Tr. 769.)

> I'm going to talk about undue influence. Plaintiff alleges that Rose Haddad's Will dated October 27, 2004 is the product of undue influence. It is the Plaintiff's burden to prove that Rose Haddad's Will is the product of undue influence. The burden of proof is clear and convincing evidence.
>
> In order to find for Plaintiff, you must find by clear and convincing evidence that Rose Haddad was a person susceptible to undue influence, meaning she was the one who was or could have been unduly influenced to yield to the desire or intent of another as a result of her age, mental condition, and/or illness; and the opportunity existed for Defendant to exert undue influence over Rose Haddad; and Defendant actually did exert undue influence on Rose Haddad; and Rose Haddad signed a Will that shows the effect of Defendant's undue influence.
>
> To invalidate a will, the undue influence must so overpower and subjugate the mind of the testator as to destroy their free agency and make them express the will of another. The influence must be such as to control the mind of the person making the will.

(Tr. 775-776.)

{¶ 36} Further, the jury interrogatories required the jurors to consider whether Rosaline was susceptible to undue influence, whether Nina had the opportunity to exert undue influence, whether Nina actually did exert undue influence, and whether the 2004 will was the product of Nina's undue influence.

{¶ 37} It is apparent from the instructions that the jury was charged with determining the issue of undue influence. Immediately after the contested instruction, the trial court elaborately explained undue influence and what the jury was tasked with determining from the evidence received. Moreover, the jury

interrogatories demonstrate that the jury considered and determined the issue of undue influence. We note that Tina contends that the instruction was "confusing," but fails to point out how or why the jury was confused or demonstrate how it prejudiced her.

{¶ 38} Tina urges us to apply this court's holding in *Green v. Myles*, 8th Dist. Cuyahoga No. 98251, 2013-Ohio-371. R.C. 2315.01(A)(7) instructs that during the reading of instructions to the jury, "the court shall not orally qualify, modify, or in any manner explain the charge or instruction to the jury." The *Green* Court noted that "not every instance in which a trial court fails to read verbatim the written jury instructions results in reversible error [but] when a court fails to adhere to the mandates of R.C. 2315.01(A)(7), challenges of bias or prejudice may arise." *Id.* at ¶ 12. In *Green*, the trial court inserted its own anecdotal language while reading the instructions that essentially mirrored the defense's argument throughout trial, suggesting a bias towards the defense. Consistent with our holding in *Green*, we find that this is not an instance where the trial court committed prejudicial, reversible error in the reading of the jury instructions. This situation is distinguishable because the error did not insert the court's own judgment or take a side. Rather, the instruction was a misstatement that was immediately remedied by paragraphs of instructions on the proper law and interrogatories clarifying the elements that the jurors were to consider. It is apparent that the jury knew that their task was to determine whether Rosaline's 2004 will was the product of undue influence.

{¶ 39} Tina's first assignment of error is therefore overruled.

## B. Hearsay Evidence and Evid.R. 804(B)(5)

{¶ 40} In her second assignment of error, Tina argues that the trial court erroneously admitted hearsay evidence in violation of Evid.R. 804(B)(5). In her brief, Tina generally cites hearsay testimony offered by Nina, Maalouf, Jocelyn, and Dr. Soliman. We first note that App.R. 16(D) requires references to the transcript where evidence admissibility is in controversy, as it is here. Tina did not demarcate these specific instances of contested testimony for our review. We further note that our own review of the record indicates that at the trial court level, Tina did not object to all of these noted instances of hearsay. We will therefore address Sabbagh's testimony as it pertains to Evid.R. 804(B)(5) because this issue was briefed prior to trial, discussed prior to trial, and implicates Evid.R. 804(B)(5), which Tina cites on appeal.

{¶ 41} Prior to trial, Tina moved the court to exclude portions of the videotaped deposition testimony of Sabbagh, arguing that the following two[1] sections of verbatim testimony constituted inadmissible hearsay:

[NINA'S COUNSEL]: What would she say about her daughter Tina?

[TINA'S COUNSEL]: Objection, hearsay. For this purpose, go ahead and answer the question.

[SABBAGH]: Okay.

[NINA'S COUNSEL]: What would she say about her daughter Tina?

---

[1] The motion included three conversations. Tina's counsel withdrew the third conversation prior to trial, so it is not included in our review.

[SABBAGH]: Okay. She — when she open up for me and I — she — like I said, I pick her up from the airport once. And after, like, she ask me about how was my life, how is life treating me, and how's my job, and she told me "You don't believe what happened." I said, "What's going on?" She said — she told me about she went to see Tina in the factory and they had the argument and Tina push her out and tell her to leave the factory. And she was very upset about that and she start crying.

[NINA'S COUNSEL]: And how did that make you feel?

[SABBAGH]: Make me feel? Very sad —

[NINA'S COUNSEL]: Yes.

[SABBAGH]: — because she don't deserve that. Not one mom deserve that. And she was a good lady. And she used to love Tina. But she always mention that Tina don't love her. She said, "I don't know why this girl don't like me and don't love me." That's what she told me. I'm telling you what she used to tell me.

[NINA'S COUNSEL]: Okay. What about her relationship with her daughter Nina, did you ever discuss her relationship with her daughter Nina?

[SABBAGH]: I don't have to discuss. She will always talk about her grandchildren and Nina all the time, talking that they live together. At the beginning she told me, when I just met her, she said, "Nina have two kids, Ray and Charbel." And she always mention, "If I can live enough to see them with married and kids." And she always talk about Nina, about her being a teacher. And they cook together. They do things together. And she will always get upset when she say, "I wish Tina's the same."

(Sabbagh deposition tr. 7-9.)

[NINA'S COUNSEL]: Now, we talked briefly earlier about her relationship with Tina, and you recalled an argument that Rose had with her daughter Tina?

[SABBAGH]: Yeah.

[NINA'S COUNSEL]: Is that right?

[SABBAGH]: She —

[NINA'S COUNSEL]: Do you remember any other arguments that she had with Tina?

[SABBAGH]: The one —

[TINA'S COUNSEL]: Just one second. I note an objection here on any hearsay. But, again, please go ahead and answer.

[SABBAGH]: I know about the factory. I don't know if I mention it. And the second one, she mention that around Christmas, and she — they had a lot of people in their house. And they had a argument, and Tina left. That's all I know. But I don't know what was the argument about or anything, but I know that they had the argument. And —

[NINA'S COUNSEL]: Who had the argument?

[SABBAGH]: Rosie and Tina. It was around Christmas time.

(Sabbagh deposition tr. 13-14.)

{¶ 42} Tina's motion suggested that these statements were inadmissible hearsay because the statements did not fit into the Evid.R. 803(3)[2] exception. Nina's responsive brief alleges several reasons that the testimony was admissible, the most pertinent to the instant matter being that Evid.R. 804(B)(5) allows Nina to present hearsay evidence to rebut evidence from Tina's case-in-chief. Before trial, the court met with counsel for both parties to discuss the pretrial motions. At this meeting, Tina's counsel argued that Evid.R. 804(B)(5) only applied to the executor; thus, only

_____

[2] Evid.R. 803(3) allows statements which prove the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health.)"

Nina could testify as to hearsay statements, not any other witness. Right before

Sabbagh's testimony was played for the jury, the court ruled on the motion, stating:

> * * * I reviewed the rule; I reviewed the case law, and I don't have a
> problem — I think the hearsay is an exception because it's in rebuttal
> from the defense, which includes — as a party of the estate.
>
> That was my understanding, is if the estate is the party that's using it,
> it doesn't have to be from the executor. It's on their behalf. That's my
> understanding.

(Tr. 560-561.)

{¶ 43} Tina's counsel objected, and Sabbagh's entire deposition was played,

including the disputed portions. On appeal, Tina argues that the trial court

erroneously admitted hearsay evidence in violation of Evid.R. 804(B)(5). She

argues that the scope of Evid.R. 804(B)(5) is narrow and intended only to apply to

actions by a creditor against an estate. She also argues generally that Evid.R.

804(B)(5) was not implicated in the instant proceeding because it was not

adversarial, and the testimony offered by the defense was not rebuttal evidence.

{¶ 44} Trial courts have broad discretion regarding the admission of

evidence, including whether the evidence is admissible hearsay. *Solon v. Woods*,

8th Dist. Cuyahoga No. 100916, 2014-Ohio-5425, ¶ 10. Although Evid.R. 802

generally bars the admission of hearsay evidence, Evid.R. 804(B)(5) allows hearsay

statements made by a deceased person if (1) the executor of the estate is a party; (2)

the statement occurred before death; and (3) the statement is offered "to rebut

testimony by an adverse party on a matter within the knowledge of the decedent."

*Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, 905 N.E.2d 1246, ¶ 30 (8th Dist.).

{¶ 45} Will contests, particularly those challenged on undue influence grounds, present a significant difficulty from an evidentiary perspective — the individual who has the most information about the will is no longer alive to testify. *Redman v. Watch Tower Bible & Tract Soc.*, 69 Ohio St.3d 98, 102, 630 N.E.2d 676 (1994). This is long recognized, and therefore, "undue influence [is] generally determined upon circumstantial evidence and inferences drawn from a full presentation of facts which may be inconclusive when taken separately, and a wide range of inquiry is, therefore, permitted." *McNeil v. McNeil*, 50 Ohio Law Abs. 487, 76 N.E.2d 621 (2d Dist.1947). The Ohio Supreme Court has held that "previous declarations are always admissible for the purpose of illustrating the mental capacity of the testator and his susceptibility to extraneous influence, and also to show his feelings, intentions, and relations to his kindred and friends * * *." *Van Demark v. Tompkins*, 121 Ohio St. 129, 136, 167 N.E. 370 (1929).

{¶ 46} We recognize that these general concepts precede Evid.R. 804(B)(5), but do find them persuasive in reviewing the trial court's evidentiary rulings. We first address Tina's contention that Evid.R. 804(B)(5) was only intended for actions initiated by a creditor against an estate. We are unpersuaded by this. The plain text of Evid.R. 804(B)(5) does not limit it to such proceedings. Further, the Ohio Supreme Court has noted that the rule, which replaced Ohio's Dead Man Statute, was "promulgated to level the playing field: if the adverse party may testify, the

decedent may testify from the grave through hearsay to rebut the testimony by the adverse party." *Eberly v. A-P Controls, Inc.*, 61 Ohio St.3d 27, 32, 572 N.E.2d 633 (1991).[3]

{¶ 47} Next, we address the trial court's ruling on the motion to limit Sabbagh's deposition testimony. Evid.R. 804(B)(5) only permits hearsay offered to rebut testimony by an adverse party. *Eberly* at 32. The exception "exists only for the benefit of the executor or other representative of a decedent's estate and is not available to a party opposing the decedent." *Kelley v. Buckley*, 193 Ohio App.3d 11, 2011-Ohio-1362, 950 N.E.2d 997, ¶ 19 (8th Dist.), citing *Johnson v. Porter*, 14 Ohio St.3d 58, 62-63, 471 N.E.2d 484 (1984). Nina was the executor of the estate and, in the instant matter, served as a representative of Rosaline's estate.

{¶ 48} Nina introduced Sabbagh's testimony in her defense to rebut the evidence presented by Tina in her case-in-chief. As the party contesting the will, Tina had the burden to demonstrate that the 2004 will was the product of undue influence. In her case-in-chief, Tina proffered evidence tending to show that Rosaline was generous and treated both daughters equally; that Tina and Rosaline had a good relationship; that Tina and Nina had a poor relationship; and Nina turned Rosaline against Tina. Nina's case, therefore, centered around rebutting this evidence. Sabbagh's testimony demonstrated that Rosaline herself had a strained relationship with Tina and that Rosaline was not just caught in the middle of Tina

---

[3] *Eberly* itself was not initiated by a creditor against an estate. It was a tort action.

and Nina's disagreements. Even if we were to accept Tina's argument that will contests are not adversarial proceedings, the point is irrelevant because Tina's and Nina's positions were clearly adverse to each other and Evid.R. 804(B)(5) permitted Nina to rebut Tina's case with hearsay from Rosaline.

{¶ 49} We therefore overrule Tina's second assignment of error.

## C. Time Period Limitations

{¶ 50} In her final assignment of error, Tina argues that the trial court erred in limiting discovery to 2003 through 2005[4] and limiting trial evidence to 2000 through 2005 via Nina's pretrial motion in limine. She argues that limiting the time periods was in contravention of Evid.R. 404(B). Tina claims that this limitation unduly constrained her ability to present her case at trial because she possessed some evidence demonstrating that Nina had access to Rosaline's bank accounts and checkbook and made several cash transfers to herself from these accounts that occurred after 2005. In response, Nina argues that Tina misconstrues the nature of an undue-influence claim and that the court properly narrowed the time relevant to an undue-influence claim.

{¶ 51} The trial court seemed to hold that it would address the evidence as it was presented, explaining,

> I think it's way too far removed, those dates, because I mean, she could be — she could have signed a POA in 2010, which would have had

---

[4] Despite raising the discovery limitation in her assignment of error, Tina does not argue this point and focuses this assignment of error on the time limitation that the court determined for trial purposes. We therefore decline to address this error.

nothing to do with the time frame we're looking at. It's just too far removed.

(Tr. 15.)

{¶ 52} During Nina's direct examination in Tina's case-in-chief, Tina's counsel requested a sidebar before introducing a document outside of the scope of trial evidence. The following conversation occurred:

> [TINA'S COUNSEL]: So they have the one signature card where she signs on behalf of her mother as POA, says she's POA. She said she was never POA, and I believe we left this open in the beginning of the trial.
>
> * * *
>
> THE COURT: I'm not sure how much it matters because if she doesn't recall and you show her something from 2016, I don't know where that gets us.

(Tr. 353-354.)

{¶ 53} Neither party disputes that the sole issue at trial was whether the 2004 will was the product of undue influence. Undue influence invalidating a will is "that which substitutes the wishes of another for those of the testator." *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962). The elements necessary to establish an undue-influence claim are (1) a susceptible testator, (2) another's opportunity to exert it, (3) the fact of improper influence exerted or attempted, and (4) the result showing the effect of such influence. *Black v. Watson*, 8th Dist. Cuyahoga No. 103600, 2016-Ohio-1470, ¶ 11, citing *West* at *id*. The existence of undue influence or the opportunity to exercise it are not sufficient; it must actually be exerted on the testator during the execution of the will. *Ament*, 180 Ohio App.3d 440, 2009-Ohio-

36, 905 N.E.2d 1246, at ¶ 45, citing *West* at *id.* Further, the contestant of the will must show that "such influence, whether exerted at the time of the making of the will or prior thereto, was operative at the time of its execution or was directly connected therewith." *Ament* at *id.*, citing *West* at *id.*

{¶ 54} A motion in limine "seeks an anticipatory ruling that evidence will probably be inadmissible, so it should be excluded until the opponent demonstrates its propriety." *Jones v. Emergency Dept. Physicians*, 8th Dist. Cuyahoga No. 68576, 1996 Ohio App. LEXIS 3864, 15 (Sept. 5, 1996). "[T]he standard of review on appeal of the grant of a motion in limine is whether the trial court abused its discretion." *Caldwell v. Lucic Ents.*, 8th Dist. Cuyahoga No. 97303, 2012-Ohio-1059, ¶ 8.

{¶ 55} Tina directs us to *Rich v. Quinn*, 13 Ohio App.3d 102, 468 N.E.2d 365 (12th Dist.1983), which held that the trial court improperly limited the evidence that could be produced at trial to a period that is not specifically stated in the opinion but is noted as "a reasonable time before and after the date on which the contested will was executed, to wit: February 11, 1982." *Id.* at 102-103. In *Quinn*, however, we note that the Twelfth District reversed the limitation of the trial court because the appellant noted that specific evidence occurring *prior* to the drafting of the will suggested that the contested will was the product of undue influence. As stated above, undue influence must be shown at the time the will was made or prior. *Ament* at ¶ 45, citing *West* at 501.

{¶ 56} Tina argues that the trial testimony stopped in 2005 but Rosaline lived 14 more years. This argument, however, misconstrues an undue-influence

claim. In those 14 years, Rosaline made no changes to the will. We acknowledge Tina's claims that Nina "had years to exploit and use her mother's assets," including making large transfers of money to herself and putting Rosaline into a nursing home when her health declined, but this issue is separate and distinct from the issue of undue influence. Undue influence contemplates the actual execution of the will as well as the period prior.

{¶ 57} Next, Tina argues that Nina's control over Rosaline's bank accounts and transfers to herself are admissible under Evid.R. 404(B) to show a pattern of elder abuse. We again reiterate that we understand Tina's plight, but these alleged acts by Nina are not germane to the issue of undue influence and were properly limited by the trial court's ruling. The settled law in our district and throughout the state is that "'[g]eneral influence, however strong or controlling, is not undue influence *unless brought to bear directly upon the act of making the will.*'" (Emphasis added.) *Young v. Kaufman*, 2017-Ohio-9015, 101 N.E.3d 655, ¶ 53 (8th Dist.), quoting *West*, 173 Ohio St. at 501, 184 N.E.2d 200. The relevant period for the undue-influence claim was contemporaneous to the time the 2004 will was executed or prior. Tina asserts that the large transfers and changes in Rosaline's bank accounts occurred in 2014 through 2017, long after the execution of the 2004 will. If such activity occurred prior to the drafting of the will, we agree that exclusion of such evidence would have been error. However, the claimed evidence is not probative of the issue.

{¶ 58} Tina's third and final assignment of error is therefore overruled.

# III. Conclusion

{¶ 59} The trial court did not err in administering the jury instructions, admitting hearsay evidence, or limiting the evidence produced at trial to the years 2000 through 2005.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR